COURT
OF APPEALS

                                       SECOND
DISTRICT OF TEXAS

                                                   FORT
WORTH

 

 

                                        NO.
2-04-400-CR

 

 

FRANK ALLEN MONTGOMERY, JR.                                         APPELLANT

 

                                                   V.

 

THE STATE OF TEXAS                                                                STATE

 

                                              ------------

 

           FROM THE 396TH
DISTRICT COURT OF TARRANT COUNTY

 

                                              ------------

 

                                             OPINION

 

                                              ------------

I. 
Introduction








Appellant Frank Allen Montgomery, Jr. appeals his
conviction and life sentence for capital murder.  In ten points, appellant complains that the
trial court erred by (1) allowing the State=s
improper commitment questions during voir dire, (2) denying his Batson challenge,
(3) and (4) admitting prejudicial photographs and prejudicial and extraneous
evidence from a prior burn the victim received, (5) allowing a witness who
lacked personal knowledge to testify, (6) overruling his motion for mistrial,
(7) allowing an expert witness to testify as to a legal conclusion, (8) denying
his motion for instructed verdict, (9) denying his jury charge instructions on
criminally negligent homicide and manslaughter, and (10) allowing the State to
make an improper jury argument during closing arguments.  We affirm.

II. 
Background Facts

This case involves the death of S.K., a
sixteen-month-old child.  S.K.=s
parents were Robert K. and Roxane L.[1]  In November 2001, Roxane, a student at
Tarrant County College, met appellant, a student at Texas Christian University,
while she was working as a cashier at a Ross store.  In December 2001, Roxane moved in with
appellant, leaving S.K. with Robert.[2]  In March 2002, Roxane took S.K. to live with
her at appellant=s apartment, and Roxane and
Robert shared custody of S.K.








On July 1, 2002, at approximately 2:20 p.m.,
Roxane went home after she received a phone call from appellant while she was
at work saying that S.K. was hurt.[3]  When she arrived home, Roxane saw that
appellant was holding S.K. over his shoulder and that he was talking on the
phone.  When Roxane went over to S.K. and
looked at her, she noticed that S.K. had a Abig burn@ on her
back.  Roxane then called S.K.=s
pediatrician, Dr. Walter Halpenny, to determine if she should take S.K. to the
hospital, and Dr. Halpenny told Roxane to bring S.K. to his office.  Roxane arrived at Dr. Halpenny=s office
at approximately 3:00 p.m.  After
examining S.K., Dr. Halpenny prescribed some ointment for the burn, but he did
not call Child Protective Services.








On July 2, 2002, Roxane stayed at home with S.K.
because of the burn.[4]  Roxane testified that they lay in bed all
day, that S.K. acted normally, and that she drank milk and ate Vienna
sausages.  Appellant was at class during
the day.  When he arrived home that
afternoon, Roxane left S.K. with appellant at approximately 4:00 p.m. to study
for a test she had at 6:00 p.m that night. 
At approximately 6:50 p.m., appellant called 911 because S.K. had
stopped breathing.  Roxane arrived home
when the paramedics were at the apartment. 
An ambulance then took S.K. to Cook Children=s
Medical Center.  When S.K. arrived at the
hospital, she did not have a heartbeat or pulse, and Dr. Michael Cowan, a
doctor in pediatric emergency medicine, told Roxane that he did not expect S.K.
to survive.  However, after administering
epinephrine, Dr. Cowan was able to get a pulse. 
At approximately 9:30 p.m. that night, S.K. was admitted to the
intensive care unit (ICU).  While S.K.
was in the ICU, doctors performed neurological tests on her brain to see if
there was any brain activity.  Despite
all the medical care, S.K. was pronounced dead the next day, on July 3, 2002,
at 1:45 p.m.

On August 27, 2004, a jury found appellant guilty
of capital murder, and the trial court assessed his punishment at life
imprisonment in the Institutional Division of the Texas Department of Criminal
Justice.[5]

III. 
Commitment Questions

In his first point, appellant contends that the
trial court abused its discretion by overruling his objection to four questions
asked by the State during voir dire examination.

A. 
Standard of Review








The trial court has broad discretion over the
process of selecting a jury.  Ewing v.
State, 157 S.W.3d 863, 866 (Tex. App._Fort Worth 2005, no
pet.); see Barajas v. State, 93 S.W.3d 36, 38 (Tex. Crim. App. 2002).  Appellate courts should not disturb a trial
court=s ruling
on the propriety of a particular question during voir dire absent an abuse of
discretion.  Barajas, 93 S.W.3d at
38; Lydia v. State, 117 S.W.3d 902, 904 (Tex. App._Fort Worth 2003, pet. ref=d).

B. 
Applicable Law

In Standefer, the court of criminal
appeals held that during voir dire a trial court should first determine if a
question is a commitment question. 
Standefer v. State, 59 S.W.3d 177, 181 (Tex. Crim. App. 2001); accord
Lydia, 117 S.W.3d at 905.  If it is a
commitment question, the next inquiry is whether the question was nevertheless
a proper question.  Standefer, 59
S.W.3d at 181-82.  A commitment question
is proper if one of the possible answers to that question gives rise to a valid
challenge for cause.  Id. at 182; Ewing,
157 S.W.3d at 866.  However, even if a
question meets the Achallenge for cause@
requirement, the inquiry does not end there. 
Lydia, 117 S.W.3d at 905. 
A proper commitment question must also contain only those facts
necessary to test whether a prospective juror may be challengeable for
cause.  Id.; see Standefer,
59 S.W.3d at 182.

C. 
Analysis








Appellant points to four questions asked by the
prosecutor as commitment questions.  We
will address each question in order.  The
first question that appellant contends is a commitment question is, AWhat are
some circumstances that would assist you maybe in determining whether [the
death] was knowing?@ 
To preserve error regarding improper voir dire questions, a party must
make a timely, specific objection at the earliest possible opportunity.  Ross v. State, 154 S.W.3d 804, 807 (Tex.
App._Houston
[14th Dist.] 2004, pet. ref=d); accord
Turner v. State, 805 S.W.2d 423, 431 (Tex. Crim. App.), cert. denied,
502 U.S. 870 (1991).  Appellant did not
object to this particular question until after a veniremember had answered the
question.  Thus, appellant did not object
at the earliest possible opportunity and has not preserved his complaint
regarding this questions.  See Halprin
v. State, 170 S.W.3d 111, 119 (Tex. Crim. App. 2005); Ross, 154
S.W.3d at 807. 

The second question that appellant contends is a
commitment question is, ALet me ask you this then.  See if anybody agrees with me.  Maybe where the location of the injury
is.  Okay?  Well, was somebody hit in the foot?  Okay? 
Or was somebody struck someplace else, maybe the head, maybe an internal
organ?@  Appellant sought a running objection to this
line of questioning.  The trial court
granted the running objection but denied appellant=s
objection to this particular question. 








Before asking this question, the prosecution had
defined the term Aknowingly@ to the
veniremembers and then asked the veniremembers what evidence they would be
looking at to determine if appellant acted knowingly.  Assuming that appellant=s
objection was sufficient to alert the trial court to a claim that the
prosecutor=s question was an improper
commitment question, we hold that the prosecutor=s
question was not an improper commitment question.  See Halprin, 170 S.W.3d at 120.  The question did not attempt to bind the
veniremembers to resolve or refrain from resolving an issue (i.e., appellant=s mental
state) on the basis of one or more facts in the questions.  See id.; Standefer, 59 S.W.3d
at 180.  

The third question that appellant complains about
is, AMr.
Holtman, somebody takes a four-year-old child, throws him off the balcony of a
five-story building, and the child hits asphalt, I mean let=s say
concrete.  What=s
reasonably likely C reasonably certain to occur?@  Appellant objected to this question, and the
trial court sustained the objection. 
Appellant did not request any additional relief from the trial court
regarding this question.  Thus, appellant
obtained all the relief he requested when the trial court granted his
objection.  See Turner, 805 S.W.2d
at 432.








The final question that appellant argues is a
commitment question is, ALet me ask it this way.  I=ll ask
it a little bit different.  With respect
to determining whether or not something is reasonably certain to have occurred,
okay, if somebody throws a child off a five-story balcony, all right, and onto
the asphalt, what=s reasonably certain to occur
with regard to the child?@ 
The State argues that this question is a permissible hypothetical
question.  It is proper to use
hypothetical fact situations to explain the application of the law.  See Cuevas v. State, 742 S.W.2d 331,
353 (Tex. Crim. App. 1987), cert. denied, 500 U.S. 929 (1991), overruled
on other grounds, Hughes v. State, 878 S.W.2d 142 (Tex. Crim. App.
1992).  However, questions may not be
asked to commit veniremembers to a position based on a set of circumstances
analogous to the case in question.  Rivera
v. State, 82 S.W.3d 64, 66 (Tex. App._San Antonio 2002, pet.
ref=d); see
Atkins v. State, 951 S.W.2d 787, 789 (Tex. Crim. App. 1997); Cuevas,
742 S.W.2d at 353.  

Here, the prosecutor was using hypothetical
questions to explain to the jury the concept of reasonable certainty.  Directly after this question, the prosecutor
asked another veniremember, AI
believe_ say a
two-year-old that can=t swim and you leave the
two-year-old right there seated on the edge of the pool and you go inside and
you=re gone
for about an hour.  What do you think is
reasonably certain to occur?  And that
child can=t swim?@  We determine that the prosecutor was
explaining the law by asking the veniremembers what would be reasonably certain
to occur in a given situation rather than asking the veniremembers to commit to
a position based on analogous circumstances.








Having determined that appellant did not properly
preserve error as to the first question, that questions two and four were not
commitment questions, and that appellant received all the relief that he
requested as to question three, we hold that the trial court did not abuse its
discretion in its ruling on these four questions.  Therefore, we overrule appellant=s first
point.

IV.  Batson
Challenge

In appellant=s second
point, he complains that the trial court erred by denying his Batson challenge
in regard to four veniremembers.  See
Batson v. Kentucky, 476 U.S. 79, 106 S. Ct. 1712 (1986).  

The Equal Protection Clause of the Fourteenth
Amendment to the United States Constitution prohibits race-based jury
selection.  Jasper v. State, 61
S.W.3d 413, 421 (Tex. Crim. App. 2001). 
When reviewing a trial court=s
finding with regard to a Batson challenge, an appellate court reverses
the ruling only if it appears clearly erroneous.  Stewart v. State, 176 S.W.3d 856, 858
(Tex. App._Houston
[1st Dist.] 2005, no pet.); see Rhoades v. State, 934 S.W.2d 113, 123
(Tex. Crim. App. 1996).  Because a trial
court is in a unique position to make such a determination, the judge=s
decision is accorded great deference.  Jasper,
61 S.W.3d at 421; Ladd v. State, 3 S.W.3d 547, 563 (Tex. Crim. App.
1999), cert. denied, 529 U.S. 1070 (2000).  








Once a party raises a Batson challenge,
the trial court must engage in a three-step inquiry.  First, the defendant must make a prima facie
showing of racial discrimination and thus carries a burden of production.  Peetz v. State, 180 S.W.3d 755, 758
(Tex. App._Houston
[14th Dist.] 2005, no pet.); see Ford v. State, 1 S.W.3d 691, 693 (Tex.
Crim. App. 1999).  Second, the burden of
production shifts to the State to present a racially neutral explanation for
its challenged strike.  Stewart,
176 S.W.3d at 858.  Finally, the trial
judge rules on whether the neutral reasons given for the peremptory challenge
were contrived to conceal racially discriminatory intent.  Jasper, 61 S.W.3d at 421; Stewart,
176 S.W.3d at 858. 








Here, appellant argues that the State used its
peremptory challenges to remove all potential African-American veniremembers
from the panel.  During the voir dire
conference, the prosecutor explained that he used a peremptory strike on
Sabrena Perkins, veniremember three, because she indicated that rehabilitation
would be her number one priority. 
Additionally, the prosecutor stated that he struck all veniremembers
who expressed that their main goal was rehabilitation, including two
veniremembers who were Caucasian and two who were Hispanic.  A veniremember=s belief
in rehabilitation as the primary goal of punishment is a race‑neutral
reason for the exercise of a peremptory challenge.  Victor v. State, 995 S.W.2d 216, 222
(Tex. App._Houston
[14th Dist.] 1999, pet. ref=d); see
Adanandus v. State, 866 S.W.2d 210, 225 (Tex. Crim. App. 1993), cert.
denied, 510 U.S. 1215 (1994).  We
conclude that the prosecutor=s
explanation for exercising a peremptory challenge against veniremember three
was race neutral.








Additionally, the State explained that it used
peremptory strikes on Deborah Sims, veniremember eighteen, and Valerie Sample,
veniremember thirty, because both Sims and Sample stated that they had family
members who had been, or still were, in prison. 
Sims stated that her husband had been in prison twice for robbery and drugs
and that he had only been out of prison for approximately one year.[6]  Sample said that her grandson had been convicted
for murder and that she did not think she could set aside her personal
situation and base the verdict solely on what was heard during appellant=s
trial.  Texas courts have held that
strikes of a prospective juror on the basis that he or she has a family member
or close friend who had been arrested, charged, or convicted of a crime are
race neutral.  Alexander v. State, 919
S.W.2d 756, 765 (Tex. App._Texarkana
1996, no pet.); see Murray v. State, 861 S.W.2d 47, 52 (Tex. App._Texarkana 1993, pet. ref=d); Garcia
v. State, 833 S.W.2d 564, 567 (Tex. App._Dallas 1992), aff'd on
other grounds, 868 S.W.2d 337 (Tex. Crim. App. 1993).  We hold that the prosecutor provided a
racially-neutral reason for exercising peremptory strikes against veniremembers
eighteen and thirty.

In regard to veniremember thirty-six, appellant
did not preserve error for review on appeal. 
To preserve error for appellate review, the complaining party must make
a specific objection and obtain a ruling on the objection.  Wilson v. State, 71 S.W.3d 346, 349
(Tex. Crim. App. 2002).  Here, appellant
did not object or obtain a ruling on this Batson challenge; therefore,
he did not properly preserve error. 
Having determined that the State provided racially-neutral reasons for
exercising peremptory strikes against veniremembers three, eighteen, and
thirty, and that appellant failed to properly preserve error in regard to
veniremember thirty-six, we overrule appellant=s second
point.

V. 
Photographs

In his third point, appellant complains that the
trial court abused its discretion in admitting State=s
exhibits twenty-three through twenty-seven into evidence because the
prejudicial effect of the photographs substantially outweighed their probative
value.








The admissibility of photographs over a challenge
is within the sound discretion of the trial court.  Moreno Denoso v. State, 156 S.W.3d
166, 177 (Tex. App._Corpus
Christi 2005, pet. ref=d); see Rojas v. State,
986 S.W.2d 241, 249 (Tex. Crim. App. 1998); Montgomery v. State, 810
S.W.2d 372, 378-80 (Tex. Crim. App. 1990). 
The trial court=s decision will be reversed only
if it was Aoutside the zone of reasonable
disagreement.@ 
Moreno Denoso, 156 S.W.3d at 177.

Under rule 403, a trial court may exclude
relevant evidence Aif its probative value is
substantially outweighed by the danger of unfair prejudice, confusion of the
issues, or misleading the jury, or by considerations of undue delay, or
needless presentation of cumulative evidence.@  Tex.
R. Evid. 403; Petruccelli v. State, 174 S.W.3d 761, 765 (Tex.
App._Waco
2005, pet. ref=d).  We generally consider the following factors
in any prejudice-versus-probative value analysis:  (1) how probative is the evidence, (2) the
potential of the evidence to impress the jury in some irrational, but
nevertheless indelible way, (3) the time the proponent needs to develop the
evidence, and (4) the proponent=s need
for the evidence.  Solomon v. State, 49
S.W.3d 356, 366 (Tex. Crim. App. 2001).  








A court may consider the following factors in
determining whether the probative value of photographs is substantially
outweighed by the danger of unfair prejudice: 
(1) the number of exhibits offered, (2) their gruesomeness, (3) their
detail, (4) their size, (5) whether they are offered in color or in black and
white, (6) whether they are close-up, and (7) whether the body depicted is
clothed or naked.  Sosa v. State,
Nos. 14-03-01116-CR, 14-03-01117-CR, 14-03-01118-CR, 2005 WL 171352, at *3
(Tex. App._Houston
[14th Dist.] Jan. 27, 2005, pet. ref=d); see
Rojas, 986 S.W.2d at 249.  Autopsy
photographs are generally admissible unless they depict mutilation caused by
the autopsy itself.  Frank v. State,
183 S.W.3d 63, 77 (Tex. App._Fort
Worth 2005, pet. filed); see Rojas, 986 S.W.2d at 249.  Photographs that depict the nature, location,
and extent of a wound have been declared probative enough to outweigh any
prejudicial effect.  Frank, 183
S.W.3d at 78; see Legate v. State, 52 S.W.3d 797, 807 (Tex. App._San Antonio 2001, pet.
ref=d).








The photographs were introduced during the
testimony of Dr. Marc Andrew Krouse, the deputy chief medical examiner for
Tarrant County.  State=s
exhibits twenty-one and twenty-two are external autopsy photographs depicting a
bruise behind S.K.=s ear and a bruise on her
forehead.  The photographs are
approximately eight and a half by ten and three-fourths inches in size, are
moderately close-up, were offered in color, and are not gruesome.  State=s
exhibits twenty-three through twenty-seven are autopsy photographs showing
bleeding under S.K.=s scalp[7]
and on her brain.  The photographs are in
color and show the exposed brain and scalp from different angles.  The admitted photographs are gruesome and
show a considerable amount of blood on the brain.  However, the photographs depict the wounds
S.K. suffered and are no more gruesome than the facts of the offense
itself.  See Sosa, 2005 WL 171352,
at *3; see also Sonnier v. State, 913 S.W.2d 511, 519 (Tex. Crim. App.
1995).  

Appellant argues that the photographs did not
clearly demonstrate the facts to which Dr. Krouse was testifying.  Dr. Krouse testified that the manner of S.K.=s death
was homicide and that the cause of death was blunt force trauma to the
head.  He further testified about her
injuries and the blood found on S.K.=s brain,
which is typically not supposed to be there. 
We conclude that the photographs did illustrate Dr. Krouse=s
testimony.  We hold that the probative
value of the photographs was not substantially outweighed by their prejudicial
effect.  See Tex. R. Evid. 403.  Thus, we determine that the trial court did
not abuse its discretion by admitting State=s
exhibits twenty-one through twenty-seven. 
Frank, 183 S.W.3d at 78. 
Therefore, we overrule appellant=s third
point.

VI. 
Extraneous Offense








In his fourth point, appellant contends that the
trial court abused its discretion by denying his motion to exclude extraneous
evidence of a burn that S.K. received on her back the day before her
death.  Specifically, appellant argues
that the probative value of evidence of the burn was substantially outweighed
by the danger of unfair prejudice.

A. 
Applicable Law

Article 38.36 of the code of criminal procedure
specifies what evidence can be used in murder trials.  Tex.
Code Crim. Proc. Ann. art. 38.36 (Vernon 2005).  The relevant section of article 38.36
provides,

In all prosecutions for murder, the state or the defendant shall be
permitted to offer testimony as to all relevant facts and circumstances
surrounding the killing and the previous relationship existing between the
accused and the deceased, together with all relevant facts and circumstances
going to show the condition of the mind of the accused at the time of the
offense. 

 

Id. ' 38.36(a).  Evidence admitted under article 38.36 is
subject to rules of evidence 403 and 404(b). 
See Smith v. State, 5 S.W.3d 673, 679 (Tex. Crim. App.
1999).  

Rule 403 states, AAlthough
relevant, evidence may be excluded if its probative value is substantially
outweighed by the danger of unfair prejudice, confusion of the issues, or
misleading the jury, or by considerations of undue delay, or needless
presentation of cumulative evidence.@  Tex. R. Evid. 403.
Rule 404(b) provides,








Evidence of other crimes, wrongs or acts is not admissible to prove
the character of a person in order to show action in conformity therewith.  It may, however, be admissible for other purposes,
such as proof of motive, opportunity, intent, preparation, plan, knowledge,
identity, or absence of mistake or accident, provided that upon timely request
by the accused in a criminal case, reasonable notice is given in advance of
trial of intent to introduce in the State=s case-in-chief such evidence other than that
arising in the same transaction.  

 

Tex.
R. Evid.
404(b).

 

B. 
Standard of Review

The admissibility of evidence is within the
discretion of the trial court and will not be overturned absent an abuse of
discretion.  Moses v. State, 105
S.W.3d 622, 627 (Tex. Crim. App. 2003); Soto v. State, 156 S.W.3d 131,
134 (Tex. App._Fort
Worth 2005, pet. ref=d). That is to say, as long as
the trial court=s ruling was within the zone of
reasonable disagreement, the appellate court should affirm.  Moses, 105 S.W.3d at 627; Montgomery,
810 S.W.2d at 387-88 (op. on reh=g); Karnes
v. State, 127 S.W.3d 184, 189 (Tex. App._Fort Worth 2003, no
pet.).  In situations such as this, we
will affirm the decision of the trial court if there is any valid ground upon
which the decision could have been made. Soto, 156 S.W.3d at 134; accord
State v. Ross, 32 S.W.3d 853, 856 (Tex. Crim. App. 2000).  To constitute an extraneous offense, the
evidence must show that a crime or bad act was committed and that the defendant
was connected to it.  Moreno v. State,
858 S.W.2d 453, 463 (Tex. Crim. App. 1993), cert. denied, 510 U.S.
966 (1993).








Rule 404(b) prohibits the admission of evidence
of Aother
crimes, wrongs, or acts@ in a criminal case to prove
that the defendant acted in conformity with his character to commit
crimes.  Tex. R. Evid. 404(b); Marc v. State, 166 S.W.3d 767,
775 (Tex. App._Fort
Worth 2005, pet. ref=d).  Such evidence of extraneous offenses may be
admitted for other purposes, however, such as proof of motive, opportunity,
intent, preparation, plan, knowledge, identity, or absence of mistake or
accident.  See Moses, 105 S.W.3d
at 626.  The circumstances listed in rule
404(b) of when character evidence may be used are illustrative, not
exhaustive.  Montgomery, 810
S.W.2d at 387.

C. 
Analysis

The State offered the evidence of the burn for
the purposes of showing appellant=s state
of mind and the relationship between appellant and S.K.  At a hearing outside the presence of the
jury, appellant objected to the evidence on rule 403 grounds, and the trial
court overruled appellant=s objection.  However, the trial court gave the jury a
limiting instruction on the burn evidence:








Ladies and gentlemen, I need to give you a specific instruction.  Earlier this morning when Dr. Halpenny
testified, he testified as to an event that may have occurred on a day prior to
the date of this alleged offense.  I want
to instruct you that [appellant] is on trial solely for the charges contained
in the indictment.  There may have been
other acts introduced into evidence and with regard to those acts, you [are]
instructed that that was admitted only for the purpose of showing the state of
mind of [appellant] and the child, and the previous and subsequent relationship
between [appellant] and the child, if it does, for you.  Okay.

 

Now, before you consider any other act not alleged in the indictment,
you must believe beyond a reasonable doubt that [appellant] committed those
acts, if they were committed, and then you may only consider them for the
purposes that I told you before, the state of mind of [appellant] and the
child, and the previous and subsequent relationship between [appellant] and the
child.

 

The State argues that the burn evidence was
admissible under article 38.36 because in appellant=s
written statements, he stated that any injury that he inflicted on S.K. the
night of her fatal injury was accidental. 
We agree.  The day before her
fatal injuries, S.K. was in appellant=s sole
care when she received a large second degree burn on her back.  Several doctors testified that the burn was
suspicious because of its location (i.e., the middle part of her back).  We conclude that the burn evidence is
relevant under article 38.36 to show appellant=s state
of mind and his relationship with S.K. and does rebut his claim of the
accidental nature of the injury that resulted in her death.








Appellant relies on Cain v. State to
support his argument. 642 S.W.2d 806 (Tex. Crim. App. 1982).  However, Cain is distinguishable from
the present case.  In Cain, the
court of criminal appeals determined that the trial court erred by admitting
evidence of the extraneous offenses of rape and sodomy against the victim.  Id. at 808.  The court determined that the two extraneous
offenses were not relevant to the defendant=s case
because there was no evidence that connected appellant with the offenses.  Id.  Here, however, appellant admitted in his
written statement that he was with S.K. when she received the burn.  We believe that the State has shown that
appellant was connected with the burn that S.K. received.  See id. at 809.  








Because the thrust of appellant=s
complaint is that the evidence is substantially more prejudicial than probative
under rule 403, we must also determine whether the trial court abused its
discretion by admitting the evidence over appellant=s rule
403 objection.  See Tex. R. Evid. 403.  The burn was important to explain the nature
of the relationship between appellant and S.K. because appellant disputed that
he inflicted S.K.=s injuries and that even if he
did so, he did not do so knowingly. 
Although several witnesses testified about the burn, it took minimal
time to develop the evidence.  The burn is
mentioned in only thirty-three pages out of about several hundred in the record.
The testimony and photograph of the burn was not so graphic that it would have
impressed the jury in an irrational, yet indelible way, and it was not as
disturbing as the testimony about the injuries that caused S.K.=s
death.  Finally, the State has a
compelling need for the evidence because its case was entirely circumstantial,
and appellant contested both his identity as the perpetrator and his state of
mind.  Thus, after balancing the rule 403
factors, we conclude and hold that the trial court did not abuse its discretion
by overruling appellant=s objection to the burn
evidence.  

Having determined that the burn evidence was
relevant, admissible, and not substantially more prejudicial than probative, we
hold that the trial court did not abuse its discretion by admitting the
evidence.  Thus, we overrule appellant=s fourth
point.  

VII. 
Admission of Evidence

In point five, appellant asserts that the trial
court abused its discretion by overruling his objection to the testimony of
Commander Dean Simonds, a police officer with the Benbrook Police Department,
regarding S.K.=s height because it was not
based on his personal knowledge.

A. 
Applicable Law

Rule of evidence 602 governs when a witness can
testify.  Tex. R. Evid. 602. 
Rule 602 provides, AA
witness may not testify to a matter unless evidence is introduced sufficient to
support a finding that the witness has personal knowledge of the matter.  Evidence to prove personal knowledge may, but
need not, consist of the testimony of the witness.@  Id.  

B. 
Analysis








Appellant argues that the State failed to prove
that Commander Simonds had personal knowledge about S.K.=s
height; therefore, the trial court erred in admitting the evidence.  At trial, Commander Simonds testified that he
did not obtain S.K.=s height during his
investigation.  However, Commander
Simonds stated that he incorporated the autopsy report into the police report
and that the autopsy report stated that S.K.=s height
was twenty-nine and one-half inches. 
Appellant objected on the basis that Commander Simonds did not have
personal knowledge of S.K.=s
height, and the trial court overruled the objection.

To preserve error, a party must continue to
object each time the objectionable evidence is offered.  Fuentes v. State, 991 S.W.2d 267, 273
(Tex. Crim. App.), cert. denied, 528 U.S. 1026 (1999); Ethington v.
State, 819 S.W.2d 854, 858-59 (Tex. Crim. App. 1991).  A trial court=s
erroneous admission of evidence will not require reversal when other such
evidence was received without objection, either before or after the
complained-of ruling.  Leday v. State,
983 S.W.2d 713, 718 (Tex. Crim. App. 1998); Johnson v. State, 803
S.W.2d 272, 291 (Tex. Crim. App. 1990), cert. denied, 501 U.S. 1259
(1991), overruled on other grounds by Heitman v. State, 815 S.W.2d 681
(Tex. Crim. App. 1991).  This rule
applies whether the other evidence was introduced by the defendant or the
State.  Leday, 983 S.W.2d at 718.








Here, Dr. Krouse testified immediately after
Commander Simonds.  Dr. Krouse stated
that at the time of her autopsy, S.K. was twenty-nine and one-half inches
tall.  Appellant did not object to this
testimony.  Because appellant did not
object to Dr. Krouse=s testimony, we hold that he did
not preserve error.  Further, the
evidence is of an objective nature.  Its
accuracy was readily verifiable and controvertible, but appellant never offered
controverting testimony.  Even if he had,
we cannot see how the admission of the evidence could have prejudiced or harmed
appellant.  Therefore, we overrule
appellant=s fifth point.

VIII. 
Testimony of Polygraph Examination

In point six, appellant argues that the trial
court abused its discretion in denying his motion for mistrial when a State=s witness
mentioned polygraph testing during his testimony.

A. 
Applicable Facts

During the State=s
redirect examination of Michael Holden, a civilian employee who occasionally
works with the Benbrook Police Department, the prosecutor asked Mr. Holden
whether he typically videotapes his interviews:

[State]:  Mr. Holden, you were
asked some questions with regard to the videotape capability in your office; is
that correct?

 

[Holden]:  Yes, ma=am.

 

[State]:  Can you explain to the
jury whether or not_ whether it=s the rule or the
exception for you to videotape an interview?

 








[Holden]:  Depending upon the
case, it would_ it would depend on
whether it was the rule or the exception_ [an] example I would
give all ladies that come in to take a polygraph, they=re all videotaped for
reasons to protect.  [Emphasis added.]

 

The defense attorney then asked for a bench
conference, and the jury was removed from the courtroom.  During the conference, the trial judge stated
that he believed that Mr. Holden=s
comment about the polygraph was Atotally
inadvertent,@ and the defense attorney
agreed.  Appellant then asked for a
mistrial on the basis that Mr. Holden=s
testimony was a violation of the motion in limine, and the trial court denied
the motion.  When the jury returned to
the courtroom, the trial judge gave the following instruction, ALadies
and gentlemen, in the last answer of the witness, Mr. Holden was discussing
sometimes in his line of work ladies come in to take polygraphs.  That=s not
applicable in this case and you are to totally disregard it in considering his
testimony.@

B. 
Analysis








A trial court may not admit polygraph examination
evidence or consider it for any purpose. 
Wright v. State, 154 S.W.3d 235, 238 (Tex. App._Texarkana 2005, pet. ref=d).  The court of criminal appeals has held that
when a witness gives an unresponsive answer that mentions a polygraph test, but
does not mention the results of the test, there is no error in failing to grant
a mistrial when the objection has been sustained and the jury instructed to
disregard.  Peoples v. State, 928
S.W.2d 112, 116 (Tex. App._Houston
[1st Dist.] 1996, pet. ref=d); see,
e.g., Richardson v. State, 624 S.W.2d 912, 914-15 (Tex. Crim. App. 1981);
Reed v. State, 522 S.W.2d 466, 468 (Tex. Crim. App. 1975).

Here, Mr. Holden did not testify that any
polygraph examination was given to appellant, much less to the results of a
polygraph examination. Additionally, there is no indication that the prosecutor
elicited the information from Mr. Holden, and defense counsel even agreed that
it was completely inadvertent.  Moreover,
the trial court instructed the jury to disregard the testimony regarding the
polygraph examination when it denied appellant=s motion
for mistrial.  Because Mr. Holden did not
testify as to the existence of a polygraph examination taken by appellant and
the trial court instructed the jury to disregard the evidence, we hold that the
trial court did not abuse its discretion by denying appellant=s motion
for mistrial.  Thus, we overrule
appellant=s sixth point.

IX.  Expert
Witness Testimony

In appellant=s
seventh point, he contends that the trial court abused its discretion by
overruling his rule of evidence 705 objection to a portion of the testimony of
Dr. Cowan, a State=s expert.  Appellant claims that the question the State
posed to Dr. Cowan would require him to give a legal conclusion.








A. 
Standard of Review

The question of whether a witness offered as an
expert possesses the required qualifications rests largely in the trial court=s
discretion.  Wyatt v. State, 23
S.W.3d 18, 27 (Tex. Crim. App. 2000). 
Absent a clear abuse of discretion, the trial court=s
discretion to admit or exclude testimony will not be disturbed.  Id.; see Penry v. State, 903
S.W.2d 715, 762 (Tex. Crim. App.), cert. denied, 516 U.S. 977
(1995).  

B. 
Applicable Law

Rule of evidence 702 governs the testimony of
expert witnesses:  AIf
scientific, technical, or other specialized knowledge will assist the trier of
fact to understand the evidence or to determine a fact in issue, a witness
qualified as an expert by knowledge, skill, experience, training, or education
may testify thereto in the form of an opinion or otherwise.@  Tex.
R. Evid. 702.  Additionally, rule
704 provides, ATestimony in the form of an
opinion or inference otherwise admissible is not objectionable because it
embraces an ultimate issue to be decided by the trier of fact.@  Tex.
R. Evid. 704.  Further, rule 705
discusses when an expert can disclose facts or data that he has based his
opinion upon.  Tex. R. Evid. 705.  The
pertinent part of rule 705 provides,








(a) Disclosure of Facts or Data.  The expert may testify in terms of opinion or
inference and give the expert=s reasons therefor without prior disclosure of
the underlying facts or data, unless the court requires otherwise.  The expert may in any event disclose on
direct examination, or be required to disclose on cross-examination, the
underlying facts or data.  

 

(b) Voir dire.  Prior to
the expert giving the expert=s opinion or disclosing the underlying facts or
data, a party against whom the opinion is offered upon request in a criminal
case shall, or in a civil case may, be permitted to conduct a voir dire examination
directed to the underlying facts or data upon which the opinion is based.  This examination shall be conducted out of
the hearing of the jury.

 

Tex. R. Evid. 705(a), (b).  

C. 
Applicable Facts








During the State=s direct
examination of Dr. Cowan, a doctor in pediatric emergency medicine who was
testifying about the degree of force necessary to cause S.K.=s
injuries, the prosecutor asked him, ANow, if
someone had either witnessed this particular act on S.K., this violent assault,
or committed the assault themselves, would they know that_ and when I say >know,= what I
[am] referring to, would they be reasonably certain to know that S.K. could die
from this?@ 
Appellant then objected on the basis that the question called for a
legal conclusion, it assumed facts that were not in evidence, and it asked for
Dr. Cowan=s speculation on whether a
person would be reasonably certain to know that S.K. would die from her
injuries.  The State responded that Dr.
Cowan was Aqualified as an expert to
testify in the area of injuries,@ that he
had been a pediatric emergency doctor for over ten years, and that he was
qualified to give an opinion.  Appellant
then asked for a rule 705 hearing outside the presence of the jury, and the
trial court granted the hearing.  At the
rule 705 hearing, the trial court overruled appellant=s
objection, allowed Dr. Cowan to testify, and granted appellant a running
objection.

D. 
Analysis

The special knowledge that qualifies a witness to
give an expert opinion may be derived from specialized education, practical
experience, a study of technical works, or a varying combination of these
things.  Penry, 903 S.W.2d at 762;
see Wyatt, 23 S.W.3d at 27. 








At trial, Dr. Cowan testified that he is board
certified by the American Board of Pediatrics in the areas of pediatrics,
general pediatrics, and pediatric emergency medicine.  He is also a member of the Dallas County
Medical Society and the Texas Medical Association.  Dr. Cowan testified that he has written and published
several articles in the area of emergency medicine.  His most recent publication was a chapter in
a textbook, Pediatric Emergency Care, that discussed respiratory
distress in pediatric patients.  He has
also testified as an expert in criminal cases before.  Additionally, each year, Dr. Cowan is
required to attend twenty-four hours of continuing medical education, of which
fourteen hours must be completed in the area of trauma.  During the past ten years of practice, Dr.
Cowan estimated that he had seen approximately 40,000 patients.  Dr. Cowan further testified that he reads
peer-reviewed medical journals that discuss topics pertinent to the emergency
room.

Additionally, Dr. Cowan was S.K.=s
treating physician in the emergency room on July 2, 2002.  He testified that he reviewed her CAT scan
and that her head injuries were severe. 
Dr. Cowan stated that it took a significant amount of energy applied to
S.K.=s brain
to cause her injuries.  He further stated
that S.K. would have been symptomatic within minutes of receiving the head
injury. Dr. Cowan testified that S.K. would have been unconscious fairly
quickly.








At a hearing, outside the presence of the jury,
Dr. Cowan testified that  he based his
opinion on his practice in emergency medicine and what he saw in the emergency
room while treating S.K.  Dr. Cowan also
stated that he based his opinion on the research he obtained after interviewing
approximately twelve to thirty individuals over the past ten to twelve years
who might have inflicted the same type of trauma that S.K. received on other
children.  During the interviews, Dr.
Cowan acknowledged that not all of the individuals admitted that they knew that
death would be a result of their actions. 
The trial court overruled appellant=s
objection and held that Dr. Cowan was qualified to testify.  Appellant contends that Dr. Cowan was not
qualified to testify on what someone believed would happen if they saw an
assault.  We conclude, however, that the
training, experience, research, seminars, and periodicals about which Dr. Cowan
testified and upon which he based his medical opinion qualified him to testify
as an expert witness.  See Wyatt,
23 S.W.3d at 27.  Because we hold that
the trial court did not abuse its discretion by allowing Dr. Cowan to testify
as an expert witness, we overrule appellant=s
seventh point. 

X.  Motion
for Instructed Verdict 

In appellant=s eighth
point, he argues that the trial court erred by denying his motion for
instructed verdict and that the evidence is factually insufficient to support
the verdict.  Specifically, he argues that
the evidence is legally and factually insufficient to prove that (1) appellant
had the requisite mental state to commit the offense, and (2) appellant injured
S.K. or  was with S.K. when she was
injured.

A. 
Standards of Review








A challenge to the denial of a motion for
instructed verdict is actually a challenge to the legal sufficiency of the
evidence.  McDuff v. State, 939
S.W.2d 607, 613 (Tex. Crim. App. 1997); Franks v. State, 90 S.W.3d 771,
789 (Tex. App.CFort Worth 2002, no pet.).  In reviewing the legal sufficiency of the
evidence to support a conviction, we view all the evidence in the light most
favorable to the verdict in order to determine whether any rational trier of
fact could have found the essential elements of the crime beyond a reasonable
doubt.  Jackson v. Virginia, 443
U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); Hampton v. State, 165 S.W.3d
691, 693 (Tex. Crim. App. 2005).

In reviewing the factual sufficiency of the
evidence to support a conviction, we are to view all the evidence in a neutral
light, favoring neither party.  See
Zuniga v. State, 144 S.W.3d 477, 481 (Tex. Crim. App. 2004).  The only question to be answered in a factual
sufficiency review is whether, considering the evidence in a neutral light, the
fact finder was rationally justified in finding guilt beyond a reasonable
doubt.  Id. at 484.  There are two ways evidence may be factually
insufficient:  (1) when the evidence
supporting the verdict or judgment, considered by itself, is too weak to
support the finding of guilt beyond a reasonable doubt; or (2) when there is
evidence both supporting and contradicting the verdict or judgment and,
weighing all of the evidence, the contrary evidence is so strong that guilt
cannot be proven beyond a reasonable doubt. 
Id. at 484-85.  AThis
standard acknowledges that evidence of guilt can >preponderate= in
favor of conviction but still be insufficient to prove the elements of the
crime beyond a reasonable doubt.@  Id. at 485.  In other words, evidence supporting a guilty
finding can outweigh the contrary proof but still be insufficient to prove the
elements of an offense beyond a reasonable doubt.  Id. 








In performing a factual sufficiency review, we
are to give deference to the fact finder=s
determinations, including determinations involving the credibility and demeanor
of witnesses.  Id. at 481; Cain
v. State, 958 S.W.2d 404, 407 (Tex. Crim. App. 1997).  We may not substitute our judgment for the
fact finder=s.  Zuniga, 144 S.W.3d at 482.  

A proper factual sufficiency review requires an
examination of all the evidence.  Id.
at 484, 486-87.  An opinion addressing
factual sufficiency must include a discussion of the most important and
relevant evidence that supports the appellant=s
complaint on appeal.  Sims v. State,
99 S.W.3d 600, 603 (Tex. Crim. App. 2003).

B. 
Analysis

Appellant moved for an instructed verdict at the
close of the State=s case-in-chief, and the trial
court denied the motion.  In a review of
a trial court=s denial of a motion for
instructed verdict, our review of the evidence is not limited to the evidence
presented before an appellant=s motion
for instructed verdict is made at the end of the State=s
case-in-chief.  Smith v. State,
109 S.W.3d 80, 81 (Tex. App._Texarkana
2003, no pet.).  Although appellant
acknowledges that evidence was presented that supports the verdict, he contends
that the contrary evidence is strong enough that the beyond-a-reasonable-doubt
standard could not have been met.

 

 








1. 
Evidence that Appellant Injured S.K. 








Appellant argues that the evidence is legally and
factually insufficient to show that he was the individual who injured S.K. and
that S.K. was in his care when she was injured. 
Appellant cites to Dr. Krouse=s
testimony as support for his contention that he was not with S.K. when she
sustained the injuries.  Dr. Krouse
testified that there were three areas of impact on S.K.=s head
and that he was unable to determine which injury resulted in her death.  He also stated that S.K. had one small bruise
on her right forehead that had a yellow color-change to it and estimated that
it was approximately one and one-half days old.[8]  Dr. Krouse opined that S.K.=s
injuries occurred twenty-four to thirty-six hours before her death.[9]  However, he testified that he could not pin
S.K.=s
injuries to that time frame definitively, but that it was the Amost
likely timeframe.@ 
Dr. Krouse stated that S.K. would have been symptomatic and unconscious
immediately after sustaining the injuries. 
He testified that he would expect S.K. to be unconscious within ten to
fifteen minutes at the outer time frame.

However, Dr. Cowan estimated that S.K.=s
injuries occurred between 6:00 and 6:30 p.m. on July 2, 2002, approximately
nineteen hours before her death.  He
based his opinion on the extent of S.K.=s head
injury when she arrived at Cook Children=s
Medical Center and his training and experience treating children in the
emergency room.  Dr. Cowan testified that
it was his opinion that her injuries could not have occurred at 4:00 or 5:00
p.m. that day.  He also stated that S.K.
would have been symptomatic within minutes of receiving this type of injury and
that she would have been unconscious fairly quickly.  Dr. Cowan opined that S.K. probably did not
regain consciousness after the injuries. 








Additionally, defense expert Dr. Sridhar
Natarajan, chief medical examiner of Lubbock County, agreed with Dr. Krouse=s
testimony that the injuries could have occurred at the outer frame of
twenty-four to thirty-six hours before S.K.=s
death.  However, he testified that S.K.=s
injuries could have occurred between 6:00 and 6:50 p.m. on July 2.  Further, Dr. Natarajan stated that the lethal
head injuries must have been inflicted after S.K. ate because the severity of
the injury would have prevented her from eating.[10]  Therefore, based on appellant=s
written statements, S.K. could not have received her head injury before 6:00
p.m.  Dr. Natarajan said that once S.K.
was injured, she would have had a behavioral change almost immediately after
receiving this type of injury.








Appellant contends that the evidence does not
establish that he inflicted the fatal injuries or that he was with S.K. when
she received the injuries. However, in each of appellant=s written
statements, he gave different versions as to what occurred on July 2 when he
was taking care of S.K.  In his July 9,
2002 statement, appellant stated that S.K. was breathing funny and that he laid
her down in a queen-size bed to sleep. After determining that something was
wrong with her, appellant picked S.K. up and ran out of the bedroom.  Appellant was not sure if her head hit the
door or the door frame as he was leaving the bedroom.  But in appellant=s July
12, 2002 written statement, he stated that he was certain that S.K.=s head
hit the door or the door frame when he was running out of the bedroom.  In this statement, appellant also said that
after S.K. threw up in her bed, he took her into the bathroom and gave her a
bath in the sink.  When she was in the
sink, appellant said S.K. began kicking and she flung her head back and hit the
sink with a Athud.@  After bathing and feeding S.K., appellant put
her back to sleep in her bed.  In yet
another statement, appellant stated that he might have dropped S.K. while he
was holding her.

The jury, as the trier of fact, is the sole judge
of the credibility of the witnesses and the weight to be given their
testimony.  Barcenes v. State, 940
S.W.2d 739, 744 (Tex. App.CSan
Antonio 1997, pet. ref=d); see Sharp v. State,
707 S.W.2d 611, 614 (Tex. Crim. App. 1986), cert. denied, 488 U.S. 872
(1988).  We hold that the evidence is not
so contrary to the jury=s verdict that it requires reversal.  Appellant=s
different versions of events is evidence of his consciousness of guilt, and the
jury could have reasonably concluded that appellant changed his stories because
he had something to hide.  See Couchman
v. State, 3 S.W.3d 155, 164 (Tex. App.CFort
Worth 1999, pet. ref=d).  

2.  Mental
State








With regard to mental state, appellant first
contends that the evidence is legally and factually insufficient to prove that
he had the requisite mental state to commit the offense.  To establish that appellant committed the
offense of capital murder, the State was required to show that appellant Aknowingly
cause[d] the death@ of S.K. who was under six years
of age.  See Tex. Penal Code Ann. ''
19.02(b)(1) (Vernon 2003), 19.03(a)(8) (Vernon Supp. 2005).  Proof of a culpable mental state almost
invariably depends upon circumstantial evidence.  Lee v. State, 21 S.W.3d 532, 539 (Tex.
App._Tyler
2000, pet. ref=d); Morales v. State, 828
S.W.2d 261, 263 (Tex. App._Amarillo
1992), aff'd, 853 S.W.2d 583 (Tex. Crim. App. 1993). Ordinarily, the
culpable mental state must be inferred from the acts of the accused or the
surrounding circumstances, which include not only acts, but words and
conduct.  Lee, 21 S.W.3d at 539;
Morales, 828 S.W.2d at 263; see Ledesma v. State, 677 S.W.2d 529,
531 (Tex. Crim. App. 1984).   








At trial, Dr. Krouse testified that S.K. died as
a result of blunt force injury to her head. 
He analogized S.K.=s injuries to those received
when a child is unrestrained in a car that is traveling thirty miles per hour,
the car hits a brick wall, and the child is ejected from the car.  Additionally, Dr. Cowan testified that it
took a significant amount of energy applied to S.K.=s brain
to cause her head injuries.  He stated
that the person who caused S.K.=s injuries
would have been reasonably certain to know that the injuries were going to
cause her death.  Dr. Cowan analogized
S.K.=s
injuries to those received in Amotor
vehicle crashes, especially where a patient may be unrestrained and is ejected
from the car, land[ing] on a hard surface, or the rollover of the car and the
head being_ the
child being bounced around inside the car.@  He also stated that her injuries were
analogous to a child riding a bicycle, being hit by a car, and the child being
thrown through space and hitting a hard object. 
Dr. Cowan testified that of the fifteen to twenty children he had seen
with similar injuries, S.K.=s
injuries ranked in the top five in severity. 
In addition, Dr. Natarajan stated that S.K.=s
injuries were the result of a Aviolent
trauma.@  

Further, S.K. was in appellant=s sole
care on July 1, the day before she received her head injuries, when she
received the large burn on her back.  Dr.
Krouse testified that the burn was suspicious because of its location (i.e.,
the burn was not on the protruding parts of her back, but instead was in the
center of her back).  Additionally, Dr.
Cowan said that the burn on S.K.=s back
appeared to have been inflicted and that it was suspicious because of its
location.  Dr. Natarajan also opined that
the burn was suspicious.








Additionally, we must take into account the
extent of the injuries and the relative size and strength of the parties.  Lindsey v. State, 501 S.W.2d 647, 648
(Tex. Crim. App. 1973), cert. denied, 416 U.S. 944 (1974).  Appellant was a college football player and
was five foot eight to five foot ten inches tall and weighed between one
hundred eighty and two hundred pounds. 
S.K., on the other hand, was only sixteen months old and was twenty-nine
and one-half inches tall and weighed eighteen pounds, nine ounces.  We hold that the evidence, when viewed in the
light most favorable to the verdict, supports a determination beyond a
reasonable doubt that appellant knowingly inflicted S.K.=s
injuries. 

Additionally, when viewed neutrally, the evidence
is not so obviously weak or so greatly outweighed by contrary proof that it
would not support the finding of guilty beyond a reasonable doubt. Thus, having
held that the evidence was legally and factually sufficient to show that
appellant injured S.K. and that he had the requisite mental state, we overrule
appellant=s eighth point. 

XI. 
Lesser-Included Offense Instructions

In his ninth point, appellant contends that the
trial court abused its discretion by denying his requested jury charge
instructions on criminally negligent homicide and manslaughter.  Appellant argues that evidence was presented
to the jury that entitled him to an instruction on the lesser-included
offenses.

A. 
Standard of Review








We use a two-pronged test to determine whether a
defendant is entitled to an instruction on a lesser-included offense.  Rousseau v. State, 855 S.W.2d 666,
672-73 (Tex. Crim. App.), cert. denied, 510 U.S. 919 (1993); Royster
v. State, 622 S.W.2d 442, 446 (Tex. Crim. App. 1981).  First, the lesser-included offense must be
included within the proof necessary to establish the offense charged.  Salinas v. State, 163 S.W.3d 734, 741
(Tex. Crim. App. 2005); Rousseau, 855 S.W.2d at 672-73; Royster,
622 S.W.2d at 446.  The offense must also
comport with article 37.09 of the Texas Code of Criminal Procedure.  Tex.
Code Crim. Proc. Ann. art. 37.09 (Vernon 1981); Moore v. State, 969
S.W.2d 4, 8 (Tex. Crim. App. 1998).

A lesser-included offense is defined both in
terms of the offense charged and the facts of the case.  Tex.
Code Crim. Proc. Ann. art. 37.09(1). 
Therefore, our analysis of whether an offense is a lesser-included offense
of the charged offense must be made on a case-by-case basis.  Bartholomew v. State, 871 S.W.2d 210,
212 (Tex. Crim. App. 1994); Day v. State, 532 S.W.2d 302, 315-16 (Tex.
Crim. App. 1976) (op. on reh=g).  It does not matter if the charged offense can
be established on a theory that does not contain the lesser offense; the issue
is whether the State, when presenting its case to prove the offense charged,
also includes proof of the lesser-included offense under article 37.09.  See Tex.
Code Crim. Proc. Ann. art. 37.09; Bartholomew, 871 S.W.2d at 212;
Broussard v. State, 642 S.W.2d 171, 173 (Tex. Crim. App. 1982).

B. 
Applicable Law








Penal code section 19.04 provides that Aa person
commits an offense [of manslaughter] if he recklessly causes the death of an
individual.@ 
Tex. Penal Code Ann. '
19.04(a).  AA person
acts recklessly, or is reckless, with respect to circumstances surrounding his
conduct or the result of his conduct when he is aware of but consciously
disregards a substantial and unjustifiable risk that the circumstances exist or
the result will occur.@ 
Id. ' 6.03(c) (Vernon 2003).  AThe risk
must be of such a nature and degree that its disregard constitutes a gross
deviation from the standard of care that an ordinary person would exercise
under all the circumstances as viewed from the actor=s standpoint.@  Id. 


Section 19.05 defines criminally negligent
homicide.  Tex. Penal Code Ann. '
19.05.  Section 19.05 provides, AA person
commits an offense if he causes the death of an individual by criminal
negligence.@ 
Id.  Section 6.03(d)
defines criminal negligence: 

A person acts with criminal negligence, or is
criminally negligent, with respect to circumstances surrounding his conduct or
the result of his conduct when he ought to be aware of a substantial and
unjustifiable risk that the circumstances exist or the result will occur.  The risk must be of such a nature and degree
that the failure to perceive it constitutes a gross deviation from the standard
of care that an ordinary person would exercise under all the circumstances as
viewed from the actor=s standpoint.  

Id. ' 6.03(d).








A person commits the offense of injury to a child
if Ahe
intentionally, knowingly, recklessly, or with criminal negligence, by act or
intentionally, knowingly, or recklessly by omission, causes to a child . . .
serious bodily injury.@  Id. '
22.04(a)(1) (Vernon Supp. 2005).  Section
1.07(46) defines serious bodily injury as Abodily
injury that creates a substantial risk of death or that causes death,
serious permanent disfigurement, or protracted loss or impairment of the
function of any bodily member or organ.@  Id. '
1.07(46) (Vernon Supp. 2005) (emphasis added). 


C. Applicable Facts

Dr. Krouse testified that on July 4, 2002, he
examined S.K.=s body and performed her
autopsy.  He stated that she had bruises
behind her right ear, on the back of her right ear, and on the right side of
her forehead.  S.K. also had reddening on
the back of her head that overlay a large area of bruising underneath her
scalp.  Dr. Krouse testified that the
burn on S.K.=s back was suspicious because he
would expect the burn to be on the skin that protrudes (i.e., the shoulder
blades) and not on the middle part of her back. 
He stated that appellant=s
explanation that S.K. received the burn by leaning against the oven door was
not plausible.








Dr. Krouse also testified that there was a large
area of bruising under S.K.=s scalp
and that there was some bleeding in the area where the skull bones run
together.  He stated that there was an
impact point on the back upper center part of S.K.=s
head.  Dr. Krouse testified that S.K.
sustained blunt injury to her head and that he found blood on S.K.=s brain
that was not supposed to be there.  When
he dissected S.K.=s eyes, Dr. Krouse stated that there
was bleeding in multiple layers and locations in her eyes.  He stated that the bleeding in S.K.=s retina
is a good indication that she suffered from a blunt head injury.

Dr. Krouse further testified that he could not
determine what contacted with S.K.=s head,
but that the object most likely had a flat or gently curved surface.  He said that the manner in which the object
was used was capable of causing death or serious bodily injury.  Additionally, he testified that after S.K.
sustained her head injury, she would almost certainly have been unconscious
immediately, and that if she regained consciousness, she would have been
symptomatic within seconds to minutes. 
The symptoms would include abnormal mentation and behavior,
irritability, somnolence, sleepiness, and seizures.  He said that he would expect her to be
somnolent, if not unconscious, within ten to fifteen minutes to thirty minutes.  He analogized S.K.=s
injuries to her being in an unrestrained car seat and hitting a brick wall at
thirty miles per hour.








On cross-examination, Dr. Krouse stated that it
is possible for a person to be unconscious and then regain consciousness, but
that he or she would function at a reduced capacity.  He said that it would be obvious to an
observer that S.K. was not at full capacity. 
Dr. Krouse testified that it would be unlikely that after a serious and
eventually lethal head injury a person would appear relatively normal as some
believe occurs with head injuries.  He
stated that although lucid intervals are not common, they do occur.

Dr. Krouse also testified that S.K.=s injury
had to have occurred within twenty-four to thirty-six hours preceding her
death, but that he could not definitively pinpoint the time of the injury.  He stated that the injury was consistent with
swinging S.K.=s torso and her head striking a
porcelain surface, sink, or counter. However, Dr. Krouse testified that the
injuries were not consistent with dropping S.K. from a standing height to the
floor; rather, they were consistent with forcibly taking S.K. and flinging her
to the floor.[11]

Dr. Cowan testified that S.K. arrived at the
emergency room at 7:20 p.m. on July 2, 2002. 
He stated that the paramedics were doing CPR on S.K. when she arrived,
but that she did not have a heartbeat or pulse. 
However, Dr. Cowan was able to get a pulse after injecting medication
into S.K.=s bone marrow.








After obtaining a pulse, Dr. Cowan did a primary
survey of S.K.=s body and testified that the
burn on her back was suspicious because of its location. He testified that he
believed that the burn was an inflicted injury and that S.K. did not do it
herself.  Additionally, Dr. Cowan stated
that S.K. had a rib fracture that was inconsistent with CPR.  He stated that it was a fairly new buckle
fracture and that it would take a tremendous amount of force to cause the
fracture.  Dr. Cowan testified that the
CAT scan revealed S.K.=s severe head injuries.  He further stated that S.K. had retinal
hemorrhages in both of her eyes that are usually caused by a severe shaking
force.  He stated that the person who
caused the injuries would have been reasonably certain to know that he was
causing the child=s death.

Dr. Cowan also testified that S.K. would have
been symptomatic almost immediately (i.e., within minutes) and that she would
have been unconscious fairly quickly. 
Dr. Cowan said that he was not surprised that S.K.=s skull
did not have a fracture or laceration because a fracture or laceration depends
on the force and the way the energy from the impact went to her skull and
brain. He testified that not all head injuries include fractures and
lacerations. Additionally, he stated that S.K. would not have been able to eat
or drink and that if someone walked by her after she received the injuries,
they would think that she was asleep. 
Dr. Cowan testified that S.K. would have experienced abnormal breathing
patterns fairly quickly.








Further, Dr. Cowan stated that the injuries must
have been inflicted between one hour and one and one-half hours before S.K. was
admitted to the emergency room.  He
stated that she arrived at 7:20 p.m., so the injuries most likely occurred
between 6:00 and 6:30 p.m.  He testified
that the injuries could not have occurred at 4:00 p.m. or 5:00 p.m. because of
the extent of the head injuries. 

D. 
Analysis

The trial court charged the jury on capital
murder as murder of a victim under the age of six.  Additionally, the trial court charged the
jury with appellant=s requested instructions on
recklessly causing bodily injury to a child and causing injury to a child by
criminal negligence, but did not give the instructions on manslaughter or
criminally negligent homicide.  See Tex. Penal Code Ann. ''
19.04(a), 19.05, 22.04.  The court of
criminal appeals has recognized that manslaughter and criminally negligent
homicide are both lesser-included offenses of capital murder.  Cardenas v. State, 30 S.W.3d 384,
392-93 (Tex. Crim. App. 2000). 
Additionally, injury to a child is a lesser-included offense of capital
murder.  Tex. Code Crim. Proc. Ann. art. 37.09; Paz v. State,
44 S.W.3d 98, 101 (Tex. App.CHouston
[14th Dist.] 2001, pet. dism=d).  Therefore, the first prong of the Rousseau
test has been met, and we must decide whether the record contains some evidence
that would permit a jury to rationally find that appellant is guilty only of
the lesser-included offenses of manslaughter and criminally negligent
homicide.  Rousseau, 855 S.W.2d at
672-73.








Appellant contends that there is ample evidence
to show that he had the culpable mental states of criminal negligence and
recklessness and that he was therefore entitled to the lesser-included offense
instructions of manslaughter and criminally negligent homicide as well.  As support for his contention, appellant
cites to his three written statements, State=s
exhibits four, thirteen, and nineteen.

In his July 2, 2002 statement, State=s
exhibit four, appellant stated that he got home from school that day at 3:30
p.m. and that Roxane left for school at 4:00 p.m.  After Roxane left, S.K. was in appellant=s sole
care.  At approximately 5:30 p.m., S.K.
woke up, but then went right back to sleep. 
According to this statement, S.K. woke up again at 6:10 p.m. and
appellant fed her Vienna sausages and juice. 
Appellant stated that S.K. went back to sleep at 6:30 p.m.  Appellant went into S.K.=s room
when he heard her choking.  In a panic,
appellant shook S.K. to try to get her attention, but she did not respond.  Appellant then called 911.  Appellant stated that he was holding both
S.K. and the phone at this time and that while he was running to the front
door, S.K.=s Ahead hit
the ground.@[12] 








In appellant=s July
9, 2002 statement, State=s exhibit nineteen, he said that
S.K. had not been feeling well on July 2, 2002 and that she had thrown up
twice.  After the second time she threw
up, appellant gave S.K. Vienna sausages to eat, but after noticing that she was
throwing them on the ground, he laid her down in the middle of a queen size bed
to sleep.  After approximately fifteen to
twenty minutes, appellant heard a sound coming from the bedroom and when he
went in to check on S.K., he noticed that she was breathing funny and that she
was making a gasping noise.  After
watching her for a while, appellant thought that she was okay, so he left the
room.  Appellant then stood outside the
room and when he went back in to check on her again, he noticed that Asomething
was not right.@ 
When he went over to S.K., he tried to determine if she was breathing
because she was making gasping noises again. 
Appellant then called out S.K.=s name
to see if she would answer, and he shook her. 
S.K. did not respond and her head was cool to the touch.  Appellant panicked and picked her up and when
he was racing out of the bedroom, S.K.=s head Acould
have struck the door or the door frame.@  However, appellant could not remember if S.K.=s head
actually hit the door or the door frame. 









In appellant=s July
12, 2002 statement, State=s exhibit thirteen, he stated
that between 5:00 and 5:15 p.m., he went into S.K.=s room
where she was sleeping and saw that she had thrown up in her bed.  He cleaned S.K.=s bed
and left the room.  Appellant further
said that between 5:30 and 5:45 p.m., he went back into S.K.=s room
and woke her up after noticing that she had thrown up again.  After waking her up, appellant took S.K. into
the bathroom and cleaned her off in the sink. 
While he was bathing her, S.K. began kicking her legs and flung Aher head
back and hit the sink and it made a thud sound.@  When he finished cleaning her, appellant
dried her off and put her in new clothes and then fed her Vienna sausages.  After realizing that S.K. was tired, he put
her in her bed between 6:10 and 6:20 p.m. 
Appellant further stated that he was Acertain
that [S.K.>s] head bumped the door when
[he] ran by, in a panic to get to the phone to call the police.@








Additionally, appellant argues that his
statements during interviews with Holden are ample evidence to show that he had
the required mental states for criminally negligent homicide and
manslaughter.  At trial, Holden testified
that he interviewed appellant on July 18, 2002. 
Holden stated that he interviewed appellant twice that day and that
appellant gave different stories on both occasions.  In appellant=s first
interview, he told Holden that S.K. had been vomiting and that while he was
cleaning her off in the sink, she was squirming and hit the back of her head on
the inside of the sink between five and ten times.  Appellant repeatedly told Holden that he
never caused S.K. to hit her head. 
Appellant told Holden that after he finished cleaning her off, he
attempted to feed her Vienna sausages, but she would not swallow them and kept
spitting them out.  He then put S.K. to
bed.  While she was sleeping, appellant
heard S.K. gasping for air, and he went into her room, picked her up, and
called 911.  

In appellant=s second
interview, he told Holden that while he was giving S.K. a bath, she was
squirming a lot.  He stated that at one
point S.K. pulled herself up and sat on his arm.  Appellant said that he swung S.K.=s torso
back down and that this caused the back of her head to hit the sink with a Athud.@  When she hit her head, S.K. quit moving and
appellant said that he should have called 911 right away, but that he did
not.  However, appellant finished
cleaning her and then tried to feed her, but the food fell out of her mouth and
she would not chew.  Appellant then put
her back in bed and while she was sleeping, he heard her gasping for air, so he
called 911.

1.  Error
Analysis








There was no direct evidence regarding appellant=s intent
to kill or injure.  See Saunders v.
State, 840 S.W.2d 390, 392 (Tex. Crim. App. 1992).  The evidence simply showed that S.K. was in
appellant=s sole care the day she received
a large, suspicious burn on her back, that S.K. was most likely in appellant=s care
when she received the fatal head injuries, and that S.K.=s
injuries were so severe that a person would have been reasonably certain to
know that he or she was going to cause her death.  See id. (stating only evidence linking
the defendant with crime was evidence that showed he squeezed baby=s head
fifteen days before baby=s death).  However, appellant=s
statement to Holden that he should have called 911 right away after S.K.
hit her head in the sink and stopped moving is evidence from which the jury
could have reasonably inferred that appellant was aware of, but consciously
disregarded, the substantial risk that his actions could cause, at the least,
serious bodily injury to S.K., and at the most, death.[13]  Although other evidence existed from which a
jury could conclude that appellant knew his treatment of S.K. would kill her, a
rational jury could also conclude, based on appellant=s
statement to Holden, that appellant was aware of, but consciously disregarded,
a substantial risk that death would occur. 
See id.  Accordingly, under
the latter interpretation, appellant could have been guilty only of
manslaughter.  Because the evidence
raises the issue of whether appellant was reckless in causing S.K.=s death,
he was entitled to a lesser-included offense instruction for manslaughter.  Thus, we conclude that the trial court erred
by refusing to instruct the jury on manslaughter.








But the same evidence also negates the mental
state necessary for the lesser-included offense of criminally negligent
homicideCthat
appellant ought to have been aware of, but failed to perceive, the risk of
death.  Accordingly, we hold that the
trial court did not err by refusing to instruct the jury on the lesser-included
offense of criminally negligent homicide. 
See Graham v. State, 657 S.W.2d 99, 101 (Tex. Crim. App. 1983)
(holding that an instruction on criminally negligent homicide is proper when
the defendant fails to perceive the risk of resulting death which rises to the
level of gross deviation from an ordinary standard of care).

2.  Harm
Analysis








Having determined that the trial court erred by
denying appellant=s requested instruction on
manslaughter, we must determine whether the error was harmful.  Appellate review of error in a jury charge
involves a two-step process.  Abdnor
v. State, 871 S.W.2d 726, 731 (Tex. Crim. App. 1994).  Initially, we must determine whether error
occurred.  If so, we must then evaluate
whether sufficient harm resulted from the error to require reversal.  Id. at 731-32.  Error in the charge, if timely objected to in
the trial court, requires reversal if the error was Acalculated
to injure the rights of [the] defendant,@ which
means no more than that there must be some harm to the accused from the
error.  Tex.
Code Crim. Proc. Ann. art. 36.19 (Vernon 1981); see also Abdnor,
871 S.W.2d at 731-32; Almanza v. State, 686 S.W.2d 157, 171 (Tex. Crim.
App. 1984).  In other words, a properly
preserved error will call for reversal as long as the error is not
harmless.  Almanza, 686 S.W.2d at
171.  In making this determination, Athe
actual degree of harm must be assayed in light of the entire jury charge, the
state of the evidence, including the contested issues and weight of probative
evidence, the argument of counsel and any other relevant information revealed
by the record of the trial as a whole.@  Id.; see also Ovalle v. State,
13 S.W.3d 774, 786 (Tex. Crim. App. 2000).

The error=s
harmfulness must be measured, at least in part, against the likelihood that the
jury=s
verdict was actually based on another theory of culpability unaffected by the
erroneous jury charge.  Otting v.
State, 8 S.W.3d 681, 689 (Tex. App.CAustin
1999, pet. ref=d, untimely filed); see
Atkinson v. State, 923 S.W.2d 21, 27 (Tex. Crim. App. 1996); Govan v.
State, 682 S.W.2d 567, 570 (Tex. Crim. App. 1985), overruled on other
grounds, Brown v. State, 716 S.W.2d 939, 945 (Tex. Crim. App.
1986).  The court of criminal appeals has
held that the determination of harm is essentially automatic when the defendant
is entitled to lesser-included offense instructions, but fails to get the
instructions, and the sole option for the jury is to convict the defendant of
the charged offense or acquit him.  See
Otting, 8 S.W.3d at 689; see also Saunders v. State, 913 S.W.2d 564,
571 (Tex. Crim. App. 1995).  








However, a different situation is presented if the
trial court submitted one lesser-included offense raised by the evidence while
declining to submit another that was also raised.  Otting, 8 S.W.3d at 689.  Under these circumstances, the risk that the
jury will convict of the greater offense despite its reasonable doubt is not so
apparent.  Saunders, 913 S.W.2d at
572; Otting, 8 S.W.3d at 689.  It
is at least arguable that a jury believed the defendant committed an uncharged
lesser-included offense, but was unwilling to acquit him of all wrongdoing, and
therefore inclined to compromise, would opt for a lesser-included offense that was
submitted rather than convict him of the greater offense.  Saunders, 913 S.W.2d at 572.  That it did not do so may indicate that the
failure to give the other lesser-included offense instruction was harmless
error.  Otting, 8 S.W.3d at
689.  

Here, the jury was not required to convict
appellant on the greater offense of capital murder or to acquit.  The trial court instructed the jury on the
greater offense of capital murder and the offenses of knowingly causing serious
bodily injury, recklessly causing serious bodily injury, and causing serious
bodily injury by criminal negligence.








We have already determined that appellant was not
entitled to the lesser-included offense instruction on criminally negligent
homicide.  Thus, he likewise was not
entitled to the charge he received on causing serious bodily injury by criminal
negligence.








Manslaughter, the instruction appellant was
denied, and recklessly causing serious bodily injury, the charge he was given,
are both second degree felonies and carry the same range of punishment.[14]  See Tex.
Penal Code Ann. ' 19.04, 22.04(e); Otting,
8 S.W.3d at 690.  Additionally, both
involve the same culpable mental state of recklessness.  See Tex.
Penal Code Ann. ' 19.04, 22.04(e).  Moreover, serious bodily injury is defined to
include death such that reckless serious bodily injury is also a lesser-included
offense of capital murder.  Here, the
jury, by its verdict, obviously rejected the offenses with the culpable mental
state of recklessness.  See Otting,
8 S.W.3d at 690.  If appellant was guilty
of manslaughter, he was also guilty of recklessly causing serious bodily
injury, an offense with the same range of punishment which the jury chose to
bypass.  See id.  This demonstrates the likelihood that the jury=s
verdict was unaffected by the erroneous jury charge.[15]  Id.; see also Atkinson, 923
S.W.2d at 27.  We conclude that the trial
court=s error
in refusing to instruct the jury on the lesser-included offense of manslaughter
was harmless.  Thus, we overrule
appellant=s ninth point.

XII.  Jury
Argument

In his tenth point, appellant complains that the
trial court abused its discretion by allowing the State to make an improper
jury argument during closing arguments. 

A. Applicable Law

To be permissible, the State=s jury
argument must fall within one of the following four general areas:  (1) summation of the evidence; (2) reasonable
deduction from the evidence; (3) answer to argument of opposing counsel; or (4)
plea for law enforcement.  Felder v.
State, 848 S.W.2d 85, 94-95 (Tex. Crim. App. 1992), cert. denied,
510 U.S. 829 (1993); Alejandro v. State, 493 S.W.2d 230, 231 (Tex. Crim.
App. 1973).








If a jury argument exceeds the bounds of proper
argument, the trial court=s erroneous overruling of a
defendant=s objection is not reversible
error unless it affected the appellant=s
substantial rights.  Tex. R. App. P. 44.2(b); Martinez v.
State, 17 S.W.3d 677, 692-93 (Tex. Crim. App. 2000); Mosley v. State,
983 S.W.2d at 659.  In determining
whether the appellant=s substantial rights were
affected, we consider (1) the severity of the misconduct (i.e., the prejudicial
effect of the prosecutor=s remarks), (2) curative
measures, and (3) the certainty of conviction absent the misconduct.  Martinez, 17 S.W.3d at 692-93; Mosley,
983 S.W.2d at 259.

B. 
Applicable Facts

During closing argument, the prosecutor stated,

On July the 1st, after being alone in [appellant=s] care for three hours,
[S.K.] sustained a second-degree burn. 
And [appellant], after talking his way out of it, was given the benefit
of the doubt.

 

On July the 2nd, she was left alone in his care for three hours, and
two days later[,] her little body was on a gurney in a morgue for an
autopsy.  

 

The time for giving [appellant] the benefit of the doubt is over.  [Emphasis added.]  

 

Appellant objected on the basis that the prosecutor=s
statement was Aa contravention of the
reasonable doubt instructions provided by the [c]ourt.@  The trial court overruled appellant=s
objection.

 

 








C. 
Analysis

The law provides for and presumes a fair trial,
free from improper argument by the prosecuting attorney.  Borjan v. State, 787 S.W.2d 53, 56
(Tex. Crim. App. 1990); Dickinson v. State, 685 S.W.2d 320, 322 (Tex.
Crim. App. 1984).  Here, appellant argues
that the prosecutor=s comment could have led the
jury to determine that they did not need to determine the facts beyond a
reasonable doubt.  The State contends
that the prosecutor was summing up all of the evidence and showing that the
State had met its burden of proof.  We
agree.  Moreover, the trial court
properly charged the jury with an instruction on reasonable doubt.  We conclude that the State=s jury
argument did not shift the burden of proof but, instead, summarized the state
of the evidence and was a reasonable deduction drawn from the evidence.  See Caron v. State, 162 S.W.3d 614,
618 (Tex. App._Houston
[14th Dist.] 2005, no pet.).  Therefore,
we hold that the trial court did not abuse its discretion by overruling
appellant=s objection to the State=s
argument.  We overrule appellant=s tenth
point.

 

 

 

 

 








XIII.  Conclusion

 

Having overruled appellant=s ten
points, we affirm the trial court=s
judgment.

 

 

 

 

TERRIE
LIVINGSTON

JUSTICE

 

PANEL B:   LIVINGSTON,
GARDNER, and WALKER, JJ.

 

PUBLISH

 

DELIVERED: April 27, 2006











[1]Robert and Roxane were
married when Roxane met and moved in with appellant.  





[2]Roxane testified that she
did not take S.K. when she left in December because Robert would not let her.





[3]By this time, Roxane was
working at a Kohl=s department store. 





[4]Roxane called Kohl=s on July 1 and told them
that she was not going to be able to work for two days.





[5]This was appellant=s second trial for this
offense.  On December 15, 2003, the trial
court discharged the jury after it could not reach a unanimous decision.





[6]Sims stated that her
husband had served a four-year sentence and a three-year sentence in Chicago
and that she married him approximately one year before serving as a
veniremember.





[7]State=s exhibits twenty-three
and twenty-four depict bleeding underneath S.K.=s scalp when her scalp
was pulled back, and exhibit twenty-five showed bleeding under her scalp when
her scalp was pulled forward over her face. 






[8]Appellant points to this
testimony to support his contention that he did not inflict S.K.=s injuries.  However, there was no testimony that this
bruise was the injury that resulted in S.K.=s death.





[9]On July 2, 2002, Roxane
stayed at home with S.K. because of her burn until approximately 4:00 p.m. when
appellant arrived at home.  After Roxane
left for school shortly after appellant got home, S.K. was in appellant=s sole care until the
paramedics arrived at 6:50 p.m.  





[10]In appellant=s written statement, he
claimed that he fed S.K. Vienna sausages at 6:00 p.m.





[11]In one of appellant=s versions of events, he
stated that he might have dropped S.K. when he was holding her.





[12]The record shows that
appellant made the 911 call at approximately 6:50 p.m.





[13]Appellant=s admission that he
should have called 911 right away indicates his awareness that immediate
medical care was critical. 





[14]A second degree felony
carries a punishment of Aimprisonment in the
institutional division for any term of not more than 20 years or less than 2
years.@  Tex.
Penal Code Ann. ' 12.33(a) (Vernon 2003).





[15]In Chase v. State,
a capital murder case in which the jury acquitted the defendant of the greater
charge, but convicted him of the lesser-included offense of recklessly causing
serious bodily injury, the Eastland court of appeals held that it was harmful
error for the trial court to deny a lesser-included offense instruction on
manslaughter because the prosecutor made comments during the punishment phase
that could have led the jury to assess appellant=s punishment for reckless
serious bodily injury at the maximum range when it might not have done so on
manslaughter.  968 S.W.2d 943, 946
(Tex. App.CEastland 1998, pet. ref=d.).  However, that case is inapposite because,
here, the jury convicted appellant of the greater charge.