Randy Ethan HALPRIN, Appellant,

v.

The STATE of Texas.

No. AP–74721.

Court of Criminal Appeals of Texas.

June 29, 2005.

Rehearing Denied Sept. 14, 2005.

700 (Tex.Crim.App.1991); G. Dix & R. Dawson, *Texas Practice: Criminal Practice and* *Procedure* § 44.24 (2d ed.2001).

George E. Ashford III, Dallas, for Appellant.

Tammy Ardolf, Asst. DA, Dallas, for State.

## OPINION

HERVEY, J., delivered the opinion for a unanimous Court.

Appellant and six other prison inmates (the "Texas Seven") escaped from prison in December 2000. These prison escapees murdered a police officer during a robbery at an Oshman's sporting goods store on Christmas Eve 2000. As a result of this incident, appellant was charged with capital murder. A jury convicted appellant of this offense, and the trial court sentenced appellant to death pursuant to the jury's answers to the special issues submitted at the punishment phase. Appellant raises nineteen points of error. We affirm.

In point of error one, appellant asserts that the trial court improperly excluded mitigating evidence in violation of Article 37.071(f)(4), TEX.CODE CRIM. PROC., which requires that the jury be instructed that it "shall consider mitigating evidence to be evidence that a juror might regard as reducing the defendant's moral blameworthiness." In point of error two, appellant also asserts that the trial court improperly excluded this mitigating evidence in violation of the Eighth Amendment to the United States Constitution.

In these points of error, appellant claims that the trial court erroneously excluded mitigating evidence in the form of a document offered as defense exhibit 39. Appellant argues that this document "gave weight and credence to part of [his] mitigation argument: that is, he was not the leader of the Texas Seven; he was not a principal in the decision to break out of prison; and, he was not a principal in the decision to robb [sic] Oshmans."

The top of this document states, "TDCJ Connally Unit." It ranks appellant the lowest of the Texas Seven in leadership qualities. The identity of the person who prepared the document is unknown.[1] In relevant part, the document declares:

Ranking of Offenders by
Leadership/Personality
Characteristics

After conducting interviews with civilian workers, correctional officers, and several inmates who worked closely with the escapees, a consensus was developed of which offender was the leader and which one may be the weakest. It was unanimous decision that RIVAS[2] was the leader and the weakest was determined to be [APPELLANT]. The following are ranked in order from highest (leadership) to the lowest (follower).

. . . . . . . . . .

7. [APPELLANT]-was quiet and never exhibited leadership qualities. Was consistently worried about whether his work was acceptable to the civilian workers. Very submissive characteristic. This worrisome attitude was seen to escalate a month before the escape. One civilian worker speculated whether

[APPELLANT] was undergoing some type of depression.

The trial court sustained the prosecution's hearsay objection to the document each time appellant offered it into evidence. For example, during the punishment phase of the trial, the trial court sustained the prosecution's hearsay objection to the document when appellant offered it under the business records exception to the hearsay rule.[3]

[DEFENSE]: Judge, out of the presence of the jury, I'll make a record as to Defense Exhibit No. 39 that's been admitted for record purposes at this point. We've talked about that quite a bit during the course of the trial and I just want to state for the record that Defense Exhibit 39 at the top says, it's ranking of offenders by leadership slash personality characteristics. It says that "After conducting interviews with civilian workers, correctional workers, and several inmates that work closely with the escapees, a consensus was developed of which offender was the leader and which one may be the weakest" and talks about what the decision was. It ranks the offenders from the highest to

1. It appears that this document was prepared just after the escape as an aid to law enforcement to apprehend the escapees.

2. Rivas was one of the Texas Seven escapees. He was also convicted of capital murder and sentenced to death for his role in the murder of the police officer during the robbery at the Oshman's store. This Court affirmed this conviction and sentence on direct appeal *See Rivas v. State*, No. 74,143 (Tex.Cr.App. No. 74,143, delivered June 23, 2004) (not designated for publication).

3. TEX.R. EVID. 803(6) provides that "records of regularly conducted activity" are not excluded by the hearsay rule. Rule 803(6) defines "records of regularly conducted activity" as:

A memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, made at or near the time by, or from information, transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record, or data compilation, all as shown by the testimony of the custodian or other qualified witness, or by affidavit that complies with Rule 902(10), unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness. "Business" as used in this paragraph includes any and every kind of regular organized activity whether conducted for profit or not.

the lowest, starting with Rivas as the highest and [appellant] as the lowest.

First of all, Your Honor, this document is a part of the discovery that the State gave to us. It has a distinctive number of 1550 on the bottom, which indicates what number of document it is that the State gave to us. This is not a document that was subpoenaed by the defense. It was given to us by the State.

Because it says that it's a summary that was compiled after talking to several different people, civilian workers, correctional officers, and inmates, it's not going to be the document of any one particular person. It's going to be a TDC document.

Now, witness Moczygemba, who was a TDC civilian worker who was taken down in the escape, testified that he remembered they were asked to do this type of ranking. Also another TDC worker who was taken down in the escape, and that would be—that would be Mr. Burgess, also seemed to remember being asked that sort of information. The document clearly says "TDCJ Connally Unit" on the top of it.

Now, yesterday [the defense] tried to offer that exhibit through the witness who came from the Inspector General's Office, Elizabeth Mullen. Ms. Mullen also testified that that appeared to be a TDCJ document. It says TDCJ Connally Unit on the top. Ms. Mullen said what they do, their job at the Inspector General's Office, is to investigate all of these types of matters and compile documents, reports, and such that are related to matters such as the escape.

And she says, I just don't recognize this one. Now, she also testified that, you know, she's told by her general counsel not to come here and, you know, give anything to the defense that the defense

may have subpoenaed until she talks to the State first.

Judge, one thing I did omit, Mr. S.O. Woods, a former TDCJ employee, said he went to the Inspector General's Office, he reviewed the several documents that they had, the boxes of documents that he had, and he recalled seeing this document amongst those papers.

[TRIAL COURT]: [Defense counsel], I don't believe that's an issue. It's a TDCJ document. No question about its authenticity. That's not the issue. The issue is that the conclusions on the entire document are all from hearsay from unnamed sources. That's the problem with the document.

[PROSECUTION]: We didn't know who made it, either.

[TRIAL COURT]: You don't know who the author is, you don't know where the conclusions came from, you can't go back and find out any of the source information that that ultimate opinion comes from.

So I have reviewed 39, I understand your objections. No question about its authenticity. It's simply not admissible because of hearsay.

[DEFENSE]: Well, Judge, our objection would be—I mean, our premise would be that you do have some evidence from Moczygemba and Bender where the data came from, that it's a business record of TDCJ, and that the proper sponsoring witness for that would be Ms. Mullen, except that she says I just don't recognize this particular one.

So that puts us in the position of having to rely on the State for our sponsoring witness for the document, but having that sponsoring witness say, well, I just don't recognize this particular one, even though Mr. Woods says that he saw it

amongst those papers in the Inspector General's Office.

[TRIAL COURT]: The record is clear as to the Court's ruling. Sheriff, find us a jury.

[DEFENSE]: Judge, just so I'm clear, is the Court saying that that document offered through Ms. Mullen is objected to by the State as hearsay and, therefore, the Court is not admitting it as a business document made during the course and scope of the record keeping duties of TDC?

[TRIAL COURT]: It may be a business record, but it's all hearsay.

■■■ We find that the trial court did not abuse its discretion to decide that the document did not meet the business records exception to the hearsay rule. There is no evidence showing who prepared the document or whether it is a record of regularly conducted activity. In addition, the record also reflects that appellant presented from other sources a significant amount of mitigating evidence that was cumulative of the mitigating evidence contained in the document. A TDCJ civilian employee (Moczygemba) testified that he would rank appellant's intelligence "at the very bottom" of the Texas Seven.[4] Another TDCJ civilian employee (Burgess) testified that appellant was not "a leader type."[5] Appellant also testified at length that he was a follower and not a leader and that his participation in the victim's murder was minimal. Appellant's counsel also argued appellant's lack of intelligence and leadership qualities to the jury during closing jury arguments at the punishment phase.[6] Under these circumstances, any error in excluding the document was harmless (even beyond a reasonable doubt). Cf. Leday v. State, 983 S.W.2d 713, 718 (Tex.Cr.App.1998) (overruling objection to evidence is not reversible error when other such evidence is admitted). Points of error one and two are overruled.

4.  This witness testified:

    Q.  [DEFENSE]: If I asked you based on your opinion to rank [appellant] in terms of intelligence with all the rest of [the Texas Seven] I just asked you about, what would you say?
    A.  [MOCZYGEMBA]: He was right at the very bottom.
    Q.  Okay. And I'll ask you again, did TDC ask you that type of information? Did they ask you to do that type of qualification?
    A.  They basically asked us to give them their—how would you say, their physical and mental characteristics.
    Q.  Okay. Did they use terms such as leadership?
    A.  Oh, not really, not that I can recall.
    Q.  But no doubt in your mind that Rivas was the leader?
    A.  Yes, sir.
    Q.  And those were—that was consistent with his intelligence and his character as you knew him?
    A.  Yes, sir, that's correct.
    Q.  And [appellant] you saw mopping up the floor?
    A.  Yes, sir.

5.  This witness testified:

    Q.  [DEFENSE]: Okay. What is that opinion?
    A.  [BURGESS]: Not very good. [Appellant] was—just in my opinion he was not a leader type, just that's my opinion.

6.  Appellant's counsel argued:

    Who does [appellant] meet? He meets George Rivas. Now, there's some indication by [the prosecution] somehow that he—and Mr. Rivas had gotten [appellant] and, you know, selected him somehow. You know what [appellant] is? He's a follower. No leadership qualities. Everybody down at TDC has figured that out. Burgess said he's dumb as a bag of rocks. Tell him what to do. And you look during the course of the scheme of the conduct. Is he one of the guys with the shank? No. He's the guy with the mop. What's he doing? He's not even engaging in any independent thought through the course of the escape. He's waiting until he's being told to do something and then he does it. And that comes from their witnesses.

■ In points of error three through ten, fourteen and seventeen, appellant claims that the trial court erroneously denied his challenges for cause to ten veniremembers during the voir dire process to select the primary jury panel. The record, however, reflects that appellant had one peremptory challenge remaining when he accepted the twelfth juror (Dalton).

[TRIAL COURT]: Back in open court. In the presence of [appellant], what says [appellant]?

[DEFENSE]: Judge, I need to put something on the record, if I may.

[Appellant], Mr. Ashford and I have advised you that we have burned our 15 strikes and the Court has granted us one additional strike. And we discussed with you that we can burn a strike, if you wish, on Mr. Dalton, or, if we do burn a strike for some particular reason, you can always ask the Court for an additional strike somewhere down the line.

There's no guarantee the Court would give us a strike and we've discussed those issues with you; is that correct?

[APPELLANT]: Yes.

[DEFENSE]: In understanding those issues and understanding that you have one strike left, you have advised Mr. Ashford and myself that Mr. Dalton is acceptable as a juror to you; is that correct?

[APPELLANT]: That's correct.

[DEFENSE]: You understand that some people might argue that by giving up one of your strikes, even though it's an additional strike the Court has given us, that somehow you are waiving some error. But I have explained to you, have I not, that what the Court will look at is the twelve jurors that you have in the box to determine whether or not you have been harmed somehow, even if the Court has previously made and denied

an erroneous charge by the defense that would be error, the Court or the Court of Appeals, Supreme Court of the United States, would look to see whether you were harmed by that error and in ascertaining that, look and see which twelve individuals you have in the box. And I have explained that to you?

[APPELLANT]: Yes, sir.

[DEFENSE]: And you understand there's some trial strategy involved here in accepting jurors as well and you are aware of the trial strategy of burning strikes and some of the other matters that we have been engaged in in the last six weeks; is that correct?

[APPELLANT]: That's correct.

[DEFENSE]: And understanding all of that, it's your desire to accept Mr. Dalton; is that right?

[APPELLANT]: That's correct.

[DEFENSE]: We accept Mr. Dalton as juror No. 12.

Appellant, therefore, suffered no harm from any error in the trial court's denial of these ten challenges for cause. *See John-son v. State*, 43 S.W.3d 1, 7 (Tex.Cr.App. 2001) (to show harm from erroneous denial of defense challenge for cause, defendant must show, among other things, that he exhausted all of his peremptory challenges). Points of error three through ten, fourteen and seventeen are overruled.

■ In points of error eleven through thirteen, appellant claims that the trial court erroneously denied his challenges for cause to three veniremembers during the alternate juror selection process which was separate and distinct from the process to select the primary panel. *See* Article 33.011(a), TEX.CODE CRIM. PROC.; Article 35.15(d), TEX.CODE CRIM. PROC. Appellant, however, has not shown that any of the two alternate jurors (Hoyer and Railsback)

participated in any of the jury deliberations in his case. Appellant, therefore, suffered no harm from any error in the trial court's denial of these three challenges for cause. *See Cooks v. State*, 844 S.W.2d 697, 721–22 (Tex.Cr.App.), *cert. denied*, 509 U.S. 927, 113 S.Ct. 3048, 125 L.Ed.2d 732 (1993). Points of error eleven through thirteen are overruled.

■ In points of error fifteen, sixteen, eighteen and nineteen, appellant claims that the trial court allowed the prosecution to ask four veniremembers improper commitment questions during the process to select the primary jury panel.[7] In point of error fifteen, appellant claims that the following was an improper commitment question from the prosecution to veniremember Russell.

> Q. [PROSECUTION]: Let me give you some other examples of some people say it could be or could not be. If a person knows right from wrong, so they're not insane, but, let's say, they may have a mental illness, a mental birth defect, maybe they're mentally re-

tarded. There's been a lot in the media lately about the execution of someone who is mentally retarded. And you can see how Special Issue No. 3 [the mitigating evidence special issue] could take that into account, that yeah, they're guilty, they killed the police officer. Yeah, they're probably going to be dangerous. They intended for someone to die. But their makeup, they've been that way since birth through no fault of their own. You can see the documentation if someone is mentally retarded. People say irregardless of those other decisions, that's why we get to No. 3, that could be, maybe to some people, mitigating.

[DEFENSE]: Excuse me, Mr. D'Amore. Your Honor, because of the legal nature of the Supreme Court rulings involving that recently, we object to that as an improper commitment question under Standifer [sic].

[TRIAL COURT]: Overruled.[8]

The prosecution's question did not attempt to bind the veniremember to resolve

---

7. Appellant does not state in his brief whether he challenged these veniremembers for cause, or whether he exercised peremptory challenges on them, or whether any of them actually sat on his jury. *Cf. Anson v. State*, 959 S.W.2d 203, 204 (Tex.Cr.App.1997), *cert. dism'd*, 525 U.S. 924, 119 S.Ct. 290, 142 L.Ed.2d 241 (1998) (discussing harm analysis to apply to trial court's refusal to allow proper questions to individual veniremembers).

8. After the trial court overruled appellant's objection, the following exchange occurred.

> Q. [PROSECUTION]: Some people might view it as mitigating. That's the only thing. I'm not trying to commit you one way or the other. I'm just asking do you see how that could play a part in No. 3.
> A. [RUSSELL]: Yes.
> Q. The bottom line question with Special Issue No. 3 is that you have to have an open mind to it. You have to be able to look at the evidence and see if there's something

mitigating there, and then is it sufficient in your mind to give them a life sentence, whether it's because they're mentally retarded or something else about them, some reason why the crime happened.
I mean, again, we can sit here all day long and talk about mitigating reasons. But the bottom line is, even if you can't think of something today, that you're not closing it off, you're not closing off giving somebody a life sentence.
So, that's what I need to know, and I think everyone here needs to know whether or not you are the type of person that can keep an open mind on No. 3, even though you've found him guilty of killing a police officer, even though you said he's probably going to be dangerous. Because that's the context in how this question is asked. The law says you must, because the only way you get to No. 3, you made those decisions. So, when you get there, you still have to have an open mind to a life sentence, depending on the facts of the case.

or refrain from resolving an issue (i.e., the mitigating evidence special issue) on the basis of one or more facts contained in the question. *See Standefer v. State*, 59 S.W.3d 177, 180 (Tex.Cr.App.2001) (question is a commitment question "if one or more of the possible answers is that the prospective juror would resolve or refrain from resolving an issue in the case on the basis of one or more facts contained in the question"). The totality of the voir dire record reflects that the prosecution explained that the veniremember should have an open mind and consider all of the evidence in answering the mitigating evidence special issue. This was not an improper commitment question. *See Standefer*, 59 S.W.3d at 180–82.

■ In point of error sixteen, appellant claims that the following was an improper commitment question from the prosecution to veniremember O'Brien.

Q. [PROSECUTION]: That by itself right there, if we just stop for a minute, I can take a gun out and shoot my partner here ten times and laugh about it and that's murder. It's not capital murder, but it's an intentional murder. I could get anywhere from five years in the penitentiary at the low end to 99 years or life at the high end or any-

where in between. Okay? That's for intentional murder.[9]

Even if this is a question, appellant did not object to it. He, therefore, failed to preserve any appellate claim that it was an improper commitment question. *See* TEX. R.APP. PROC. 33.1(a).

■ Appellant also claims in point of error sixteen that the following were improper commitment questions from the prosecution to veniremember O'Brien.

Q. [PROSECUTION]: You know, it's asked sometimes that you are telling me, Ms. O'Brien, that you could give somebody as little as five years in the penitentiary for intentional murder. See? That's how it's phrased. Most people think of murder they think of the example I gave you, shooting somebody horribly, a very vicious crime. Of course, it could be.

[DEFENSE]: Excuse me, Your Honor, but we're going to object as to any specific example not contained in the indictment, not reflected by allegations contained in the indictment so as to qualify a juror as to the range of punishment. We will object to it, violation of Standifer [sic].

[TRIAL COURT]: Overruled.

Q. [PROSECUTION]: Different type of intentional murder could be the un-

---

9. The voir dire record reflects that immediately after this the prosecution continued to explain:

Q. [PROSECUTION]: I guess you could say, when you find someone guilty of intentional murder, there may be, what, 94, 95, 96, separate verdicts you could do, anywhere from five years up to 99 years or life. See how that works?
A. [O'BRIEN]: Uh-huh.
Q. What the law says about that is that we can't commit you today on what you'll do in any particular situation, but what we must know, and both sides are entitled to know, is that your mind would be open to that full range of punishment, depending on the

facts. Maybe depending on as to why I killed him or as a different situation does a person, the motive of why it happened, or the reason why it happened. It's not legally justified, but maybe there's some other reason why it happened.
All you have to be able to do to satisfy the law is to say you'll have an open mind, wait to hear the evidence, and then decide what the proper punishment is. And that makes sense. You don't want to commit to something before you know the full story. Does that make sense?
A. Sure.
Q. Do you think you could do that?
A. Yes.

plugging of a life support machine in the hospital of a family member out of love instead. Intentional murder, did it on purpose, knew they were going to die, but you did it out of love so that person wouldn't be in pain.

[DEFENSE]: Again, Judge, we renew our objection in that regard.

[TRIAL COURT]: Overruled.

Assuming that appellant's objections were sufficient to alert the trial court to a claim that the prosecution's questions were improper commitment questions, we decide that the prosecution's questions were not improper commitment questions. They did not attempt to bind the veniremember to resolve or refrain from resolving an issue (i.e., the minimum punishment for an intentional murder) on the basis of one or more facts contained in the questions. *See Standefer*, 59 S.W.3d at 180.

■ Appellant also claims in point of error sixteen that the following was an improper commitment question from the prosecution to veniremember O'Brien.

Q. [PROSECUTION]: Go down the street, kill a neighbor out in the front yard. Intentional murder, not self-defense, not an accident. Then you find out that neighbor gave drugs to that person's child and killed him, drug dealer, that type of a situation. You see, it could encompass a wide variety of the

different situations what intentional murder is.

I use those as examples not to commit you in any way, but to kind of have you see intentional murder can encompass a lot of different situations. Does that make sense?

A. [O'BRIEN]: Yes.[10]

Appellant did not object to this question. He, therefore, failed to preserve any appellate claim that it was an improper commitment question. *See* Rule 33.1(a).

■ In point of error eighteen, appellant claims that the following were improper commitment questions from the prosecution to veniremember Hamblin.

Q. [PROSECUTION]: Now, of course, that, I think that wide range of punishment recognizes the wide range of circumstances that murder can be committed under. Maybe a situation where I turn to Mr. D'Amore, I don't like his tie today, and I shoot him ten times in the head, and, you know, he falls down and, you know, I dance around all happy about it. It's a brutal, heinous, intentional murder. There's nothing really plus, it's not a capital murder. You know, it could be something like that, that's an intentional murder. Or it could be an aged spouse, okay, who pulls the life support plug—

[DEFENSE]: Excuse me, Mr. Wirskye. We will object, Your Honor. That's

---

10. The voir dire record reflects that immediately after this the prosecution continued to explain:

> Q. [PROSECUTION]: So, that's why the law says you have to wait and hear the evidence, hear about the person, and then decide what the proper punishment is. My question to you in an intentional murder case if you are a juror, if you find someone guilty of intentional murder, could you then decide what the appropriate punishment is with your mind open from five years to 99 years or life, just depending on the facts?

> A. [O'BRIEN]: I think so.
> Q. So you could, although you don't have to think of a situation today, your mind is open to giving someone the minimum five years for an intentional murder, depending on the facts and if you thought it was the right thing to do?
> A. You mean, if I thought the sentence was the right thing to do?
> Q. Right.
> A. Yes.

clearly not something encompassed within the allegations contained in the indictment. It's an improper example to try to qualify the juror, potential juror, on the minimum range of punishment. We also think it's a violation of Standifer [sic], it's a commitment question, so we kindly object.

[TRIAL COURT]: Be denied.

Q. Obviously, we can't commit you to what you would do in certain instances. I just want to kind of give you some examples. A mercy killing, some people call it. You know, an aged spouse pulls the life support plug to put their long-time spouse out of misery. That would also be an intentional murder.

[DEFENSE]: We would also object, that certainly would also be aiding suicide. We're going to object to that, but certainly it wouldn't even be in the range of a murder offense, so we object once again that it's an improper example to be given.

[TRIAL COURT]: Be denied.[11]

Assuming that appellant's objections were sufficient to alert the trial court to a claim that the prosecution's questions were improper commitment questions, we decide that the prosecution's questions were not improper commitment questions. They did not attempt to bind the veniremember to resolve or refrain from resolving an issue (i.e., the minimum punishment for an intentional murder) on the basis of one or more facts contained in the questions. *See Standefer,* 59 S.W.3d at 180.

In point of error nineteen, appellant claims that the following was an improper commitment question from the prosecution to veniremember McGinnis.

Q. [PROSECUTION]: You know, you could have a really heinous murder, just a regular murder, pull a gun out and kill Mr. D'Amore because I don't like his tie. You may want to give me life for that. And you could have a knowing or intentional murder. An elderly spouse pulls the plug on life support for a long-time spouse.

[DEFENSE]: We object to that example, Judge. It's a violation of Standifer [sic] and it doesn't qualify here anyway.

[TRIAL COURT]: Be overruled. Do you understand he's just giving you examples, Mr. McGinnis?

A. [MCGINNIS]: I understand that.

[TRIAL COURT]: I figured you did. We can't talk about the facts of this case, so we just give hypotheticals. Does that make sense to you.

A. Yes, sir.

The prosecution's question did not attempt to bind the veniremember to resolve or refrain from resolving an issue (i.e., the minimum punishment for an intentional murder) on the basis of one or more facts contained in the question. *See Standefer,* 59 S.W.3d at 180. It was not an improper commitment question.

■ Finally, any error in the trial court permitting the prosecution to ask

---

11. The voir dire record reflects that immediately after this the prosecution continued to explain:

Q. [PROSECUTION]: It encompasses a wide range. My next door neighbor gives my little daughter drugs, and I get mad about it, and I go out in the front yard and shoot him dead. That's intentional murder. The jury may want to find that pretty mitigating, you know.

But, anyway, the bottom line is to all of this, as a potential juror you have to be able to keep an open mind to that full range of punishment, five all the way up to 99 years or life.

Do you think that you would have a hesitation in keeping that open mind to that entire range of punishment.

A. [HAMBLIN]: No, sir.

**122**

these four veniremembers these questions was harmless. Our review of the record indicates that none of these four veniremembers sat on appellant's jury because appellant exercised a peremptory challenge on each one of them, and that appellant had one peremptory challenge remaining after selection of the primary jury panel. *Cf. Anson,* 959 S.W.2d at 204. Points of error fifteen, sixteen, eighteen and nineteen are overruled.

The judgment of the trial court is affirmed.