In The

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

NO. 09-15-00328-CR
NO. 09-15-00329-CR
NO. 09-15-00330-CR
NO. 09-15-00331-CR
NO. 09-15-00332-CR

_____

**KIMBERLY KUCERA ADAMS, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the County Court at Law No. 5**
**Montgomery County, Texas**
**Trial Cause Nos. 14-294731, 14-294732, 14-294733,**
**14-294734 and 14-294735**

**MEMORANDUM OPINION**

Kimberly Kucera Adams (Adams or Appellant) was charged by information

with five counts of cruelty to livestock animals for failing to provide necessary

food, water, or care to horses that were in her custody. *See* Tex. Penal Code Ann.

§ 42.09 (West 2011). A jury found Appellant guilty on all five counts and assessed

1

punishment at one year in jail and a $2000 fine for each count. Appellant timely appealed, raising three issues. We affirm.

EVIDENCE AT TRIAL

Testimony of Officer Dunn

Animal Control Officer Chris Dunn (Officer Dunn or Dunn) testified for the State. In January of 2014, Officer Dunn was called to a location in Montgomery County regarding dead horses and "a divorce situation[.]" According to Officer Dunn, Adams lived at the location. Dunn explained that when he arrived he found fifteen living horses on the property, and he also saw three dead horses near the front gate in the pens and another dead horse in the barn. Dunn testified that it appeared to him that the dead horses had been there a long time because they were in a state of decomposition, although he explained that the dead horse in the barn was not "as decomposed" as the others.

Dunn noticed that about ninety percent of the fence boards were "chewed through or chewed on[,]" which suggested to him that the horses lacked food, and he was concerned about the welfare of the horses. According to Dunn, there was no hay or "feed[,]" and Adams told him she had run out of food for the horses that morning. Dunn testified that there were several places nearby that sold "horse feed or hay[,]" but Adams told him she was going to Woodville to get hay. Dunn also

2

did not see any water for the horses, and the lack of water suggested to him that Adams was not taking care of the horses. Dunn explained that he could feel the ribs on the horses and that some horses were eating their own manure, which led him to conclude that the horses had not been fed. Dunn also saw that some of the horses had diarrhea, and based on his experience, this suggested the horses were sick or had parasites. Officer Dunn also testified that all the living horses on the property were underweight and some of the horses had rain rot around the hooves, which he explained was an "infection and fungus of the skin caused by warm, damp climate."

According to Dunn, Adams told him that some of the horses had been show horses, which surprised him because the horses were not in good shape. Dunn also explained that Adams said the dead horses died in October of 2013 and that she did not want her husband to find out "because of income tax reasons[]" and did not want her husband to claim the horses on his income taxes before the first of the year.[1] Dunn also agreed that Adams also told him she believed her husband had poisoned the animals.

Officer Dunn explained to the jury that he was confident of his opinion that the horses were not in good health, he instructed Adams to get food for the horses

---

[1] We note that some witnesses referred to Michael Adams as Appellant's "husband" and others refer to him as her "ex-husband."

right away, and he also contacted the Society for Prevention of Cruelty to Animals (SPCA). According to Dunn, when he returned to the property about three days later, he observed three bales of hay, a water trough containing water, and some bags of food in the garage. The State had Dunn identify State's Exhibit 177, a videotape, which was admitted into evidence without any objection. Dunn explained to the jury that on the day of the seizure, he examined the property and horses again. Dunn agreed that, based on his experience and training, he formed an opinion that Adams had unreasonably failed to provide food, water, or care for the living and dead horses on her property. Dunn also testified that he had seen no evidence that the problems with the animals were caused by hunting, trapping, wildlife management, wildlife depredation control, or husbandry or agricultural practices. [2]

Testimony of Marshall Hefley

Marshall Hefley (Marshall) testified that Adams was his "birth mother[,]" but that his father had full custody of him since he was young. According to

---

[2] Under 42.09(f), it is an exception to the application of section 42.09 if the conduct engaged in by the actor is a generally accepted and otherwise lawful form of conduct occurring solely for the purpose of or in support of fishing, hunting, or trapping, or wildlife management, wildlife or depredation control, or shooting preserve practices as regulated by state and federal law, or animal husbandry or agriculture practice involving livestock animals. *See* Tex. Penal Code Ann. § 42.09(f) (West 2011).

Marshall, he visited Adams in 2013 and saw that the horses were in "extremely poor[]" condition and that the horses had "drastically declined[]" from their prior "pristine condition" in 2010 when they were show horses. Marshall explained that he told Adams he was concerned about the horses' health and that, if she could not care for them, she should get rid of or sell them. According to Marshall, he knew that once Adams's divorce became final, that she would not be able to afford to care for the horses, and that when he advised Adams to sell the horses, she instructed him that he "was no longer to come out there or have anything to do with them." Marshall also explained that Adams had a drinking problem and that in 2013 he was concerned after seeing her intoxicated.

Marshall told the jury that while Adams was going through her divorce from Michael, Michael's only access to the property was when Adams said it was allowed. Marshall explained, that during the marriage before Adams and Michael separated, Michael "had a great responsibility [for the horses]. He paid for all the feed. He helped with all the shows, helping get ready, doing everything necessary, making sure everybody was there on time, went to all the shows." According to Marshall, once the divorce commenced, Adams decided she could care for the horses on her own. Marshall also explained that, although there was a pond at the

5

front of the property, the horses typically drank from water troughs in the back of the property, but there was no automatic system to fill the troughs.

Testimony of Matthew Roper

Matthew Roper (Matthew), Adams's eldest son, testified that he grew up around Adams and her horses. According to Matthew, Adams had been around horses as long as he could remember and "[s]he was probably the most knowledgeable person about horses that [he] knew." But, Matthew explained that, when he visited his mother in 2013, the horses

> . . . definitely weren't in show condition. They didn't look like they'd been clipped or groomed. The fencing had all kind of been chewed through. The trees, all the bark was off of it. They were just a little bit thinner [] at that point. She was trying to maintain that whole household and horses on her [] own. The horses were starting to show that.

Matthew also testified that he observed "at least one horse dead on the property[]" in November or December of 2013, and he was concerned about the health of the horses still living on the property at that time. According to Matthew, it was "pretty obvious something needed to be done[]" and he told Adams he was concerned about the health of the horses. He explained that Adams did try to care for the animals and he did not believe the horses were being "completely neglected[]" but he stated "I think more should have been done to save them." Matthew testified that there was not enough "feed" for the horses, and that the

6

neighborhood rules concerning the number of horses on a property were "a huge fight for Adams and her ex-husband[.]" Matthew explained that, when he told Adams of his concern,

> [s]he was very worried, obviously. She had said she did a lot of research online and talked to some of her veterinarian friends and thought Mike, her ex-husband, or soon to be ex-husband, was poisoning the horses. And he bought some kind of plant and he was throwing it over the fence and they were eating it. And that's what was causing them to get sick and die.

Matthew was shocked and did not believe that Michael would do something like that. Matthew also testified that Adams "was scared and had to keep[] a lookout for anyone else coming on the property. Asking neighbors if anyone had been coming over. She was convinced someone [was] poisoning [the horses]." According to Matthew, Adams had talked with him about how to dispose of a dead horse, and she told him "she was worried that her husband would get the tax benefits from the business if they found out the horses started dying. So she wanted to keep it low key." Matthew explained that Adams was going through a divorce at that time, she had a drinking problem, she did not have a job, and she was living on income she was getting from the deceased father of two of her children.

Testimony of Deputy Smith

Deputy Don Smith (Deputy Smith or Smith), with the Montgomery County livestock division, explained that as a livestock officer, he had investigated

7

"thousands[]" of animal cruelty cases. Smith testified that he went to Adams's home on January 31, 2014, and that she was upset as they talked about the animals. Smith explained that he observed fifteen live horses on the property and three dead horses. According to Smith, Adams said she believed the horses had died after her husband had poisoned them and that he had poisoned the horses that were her favorites, and, on direct examination, he explained as follows:

Q. Did she provide you any evidence whatsoever of the poisoning?

A. No, sir.

Q. Other than the dead horses?

A. No, sir.

Q. Did you ask her a number of times about the poisoning?

A. Well, I asked her why she thought he'd poisoned them.

Q. Okay. What did she say?

A. They were going through a divorce. And those three horses were her favorite, and he poisoned them because of that.

Q. As far as you can tell did she ever report this poisoning to law enforcement?

A. No.

Q. And how -- when you asked her how were the horses poisoned what did she say?

A. I don't know how he did it, but he did it.

8

Q. Okay. Again, other than the dead horses, did she offer a scrap of evidence to corroborate that her husband had poisoned these horses?

A. No, sir.

Deputy Smith described what he observed on Adams's property. Smith explained that the fences showed that the horses were chewing the fences, which indicated to him that the horses lacked food. Smith observed both underweight or thin animals and dead animals on the property. Smith also noticed the water trough was empty, he did not find "one scrap[]" of hay, and he did not find any horse "feed[,]" although Adams said she fed the horses one to two scoops of "feed" a day. Smith told Adams to "go get feed and hay for the animals." Smith also observed some horses with diarrhea, some horses eating their own manure, and some horses with rain rot.

Smith explained that when he returned to Adams's property with a seizure warrant and to meet with the SPCA, he observed five horses standing near a dead horse. Smith explained that he regarded it as unusual for an owner to leave the dead animals lying out. According to Smith, taking care of a horse is expensive, and Smith's investigation led him to believe that Adams did not have a job.

Smith testified that it was his opinion that Adams had been cruel to her livestock within the meaning of the Penal Code, Adams could not take care of the animals, Adams unreasonably failed to provide food, water, or care for the fifteen

living horses and the three dead horses, and Adams's conduct relating to the horses was not related to fishing, hunting, animal husbandry, or agricultural practices involved with livestock animals.

Testimony of Deputy Morrow

Deputy Dwayne Morrow (Deputy Morrow or Morrow) testified that he is a livestock officer for Montgomery County and he has investigated "close to [] thousands" of animal cruelty cases. Morrow explained that he went to Adams's house on January 31, 2014, pursuant to a phone call he received from Deputy Smith concerning horses on the property. According to Morrow, upon arrival, he could see underweight horses as well as dead horses. Morrow explained that Adams said two of the horses died in October and another died in December, that the horses died because they had been poisoned, and that she had not buried the horses because she did not want her ex-husband claiming them for income tax or filing an insurance claim.

Morrow testified that he did not observe any "feed" for the horses, and Adams told him she did not have any. Morrow explained that he observed fences that had been chewed and only a "minimal" amount of water for the horses. Morrow also observed horses eating limbs and bark off a tree. Morrow was concerned about the welfare of the horses, and he returned the following week with

10

the SPCA and a seizure warrant. Morrow agreed that, if he had left the horses in Adams's care, more horses would have died, and based on his training and experience, he believed that Adams unreasonably failed to provide food, water, or care to the fifteen living and three dead horses.

Testimony of Deborah Michielson

Deborah Michielson (Michielson) testified that she is a senior animal cruelty investigator with the Houston SPCA, and that she has personally investigated thousands of animal cruelty cases. Michielson assisted in the investigation and she visited Adams's property on or about February 5, 2014. The SPCA had received reports of several deceased animals on Adams's property and, because of the possibility of a contagious disease, a veterinarian also went with Michielson to the property. According to Michielson, there were three dead horses on the property. Michielson testified that it was not good husbandry practice to leave the deceased animals with the living animals, and she regarded it as "disturbing."

Michielson testified that the water trough on the property had very little water in it and some fence boards were chewed, either due to lack of food or boredom. Michielson also regarded the lack of water as "alarming[.]" At trial, the State showed Michielson several photographs taken at Adams's property of several of the horses. Using the photos, Michielson then described the visible health

11

problems she observed with the horses, including "an unthrifty hair coat," an open sore, as well as overgrown and untrimmed hooves, being underweight, and having rain rot.

Based on her training and experience, Michielson concluded that the horses living on Adams's property were not in good health, were underweight, some had rain rot, some had hoof issues, and the animals were in "poor living conditions[]" that resulted from Adams's neglect. The State asked Michielson what seemed to be the underlying problem, to which she responded

> [t]here was lack of general care. You had deceased horses not removed, which could present a health hazard. You had underweight horses . . . . You know the big thing to me was seeing the animals -- live animals walking around with deceased animals in unclean conditions and lack of water.

Testimony of Sarah Hall

Sarah Hall (Hall) testified that she is a photographer and she and her husband have a business raising, training, and showing horses. Hall testified that she had sold four horses to Adams about three or four years earlier, including a horse called Jimmy. Hall explained she had heard there was a dead horse in the barn at Adams's property, and she feared it was Jimmy because she knew Adams kept Jimmy in the barn. Hall told the jury that she gave Officer Dunn a photograph

12

of Jimmy, and Dunn was able to confirm that the dead horse in the barn was Jimmy.

Testimony of Dr. Frank Schuman

Frank Schuman, D.V.M. (Dr. Schuman or Schuman), testified that he accompanied the SPCA to Adams's property in February 2014, and that he treated a number of horses that were seized from Adams. Upon arriving at the property, he observed that "[f]or that number of horses [it was] a small property, as well as very muddy. There was no forage. And all of the fencing had been chewed and whittled on by the horses." Schuman explained that chewed fences are typically a sign that the animals are malnourished. Dr. Schuman's veterinary records on the horses seized were admitted as State's Exhibit 183.

Schuman explained that his records for the white foal indicated the foal was quite underweight, had overgrown hooves, showed signs of parasites and anemia, and had some precursors to pneumonia. Dr. Schuman testified that the foal was in poor health and that proper nourishment and shelter as well as appropriate husbandry could have prevented this foal's ailments.

Schuman discussed the records for a palomino mare, and noted the mare was underweight, had an "alarmingly low body condition score[,]" the horse's teeth had not been floated or filed for "quite awhile[,]" the skin showed rain rot and multiple

abrasions and scars, there was severe matting of the mane and tail, "extremely overgrown" hooves that were starting to chip and crack, showed muscle atrophy, and had signs of parasites. Schuman's examination noted that the abrasions present were due to horse bites, and he explained this is typical for horses in groups that are competing for a small amount of available food. Schuman testified that the palomino mare was in poor health.

Dr. Schuman addressed the records for the paint foal and explained that the foal had a very low body condition score, was running a fever, showed signs of pneumonia, the skin was in bad condition, showed rain rot and abrasions, all hooves were overgrown, exhibited muscle wasting, showed signs of parasites, and was dehydrated. Schuman stated that "this foal is in very poor health."

Schuman next addressed the records for the sorrel mare, which he determined had a very low body condition score and was "[e]xtremely underweight." The sorrel mare also showed significant dental abnormalities, rain rot, multiple abrasions and scars likely due to bite wounds, overgrown hooves, muscle atrophy, had signs of parasites and signs of pain due to arthritis, and was dehydrated and hypoglycemic.

Dr. Schuman testified the blood work and physical exams he performed on the animals seized from Adams's property showed no signs of poisoning. Dr.

14

Schuman explained that he was not able to do any testing on the dead horses because they had been deceased for such a long time. Schuman stated that, based on his evaluation of the fifteen surviving horses as well as looking at the deceased horses, the "most likely conclusion is that the horses died of lack of nourishment, electrolyte imbalances," and general lack of care. Schuman also testified that "[t]here's not really a poison to my knowledge" that would be consistent with the symptoms displayed by the horses.

Testimony of Kimberly Adams

Adams testified on her own behalf. Adams explained that she had worked in horse-related businesses since the early 1990s, and worked as a riding instructor, facility manager, and horse trainer. In 2007, Adams's husband, Michael, bought their home on Northcrest Circle, in New Caney, which has nine acres and a barn, for the purpose of allowing Adams to keep horses. In 2010 or 2011, Michael then gave her the business of "Adams Horse Ranch, Inc.," and he instructed her to conduct the business so that they could claim it as a tax deduction. Adams explained that the business started with "seven to nine" horses, and that she did well showing several of the horses during 2012 and 2013, winning ribbons for various shows and a belt buckle. Defense counsel marked several of the ribbons and the buckle for demonstrative purposes as Defense Exhibits 1 through 7.

According to Adams, things changed "when we were going through our divorce the horses started getting into poor condition[]." Adams recalled that at one point she was supposed to appear in court for the divorce, one horse went down and could not get up, and as a result, she was late to the hearing. Adams testified that she told the judge during the divorce case that she believed Michael was poisoning the horses. According to Adams, the first horse that went down and could not get up was named "Kiwi," and that at some point three more horses went down and could not get up, and those horses died.

According to Adams, her husband "had threatened to kill them in the past[]" and "[w]hen you go through a bad divorce if a man wants to hurt you he tries to hurt you through your kids or what you love next. And that's my animals." She told the jury that one horse seemed to have a problem with a hip and was eventually diagnosed with EPM, which she explained is a neurological condition. Another horse dropped weight and had rectal bleeding and eventually that horse died. She explained that the horse named Jimmy died in December, and the other horses died in October or November.

Adams testified that, in addition to receiving "Social Security money for the kids[,]" she worked as a certified equine appraiser, she gave riding lessons, and worked informally as a horse broker. She denied that she used any money she

16

received from her husband to pay expenses for the horses, and she explained that the money she received from Social Security "went straight to the horse care because all that money was spent on the horses because that was the way I was going to take care of them." She testified that she had "accounts running" with various "feed stores" because she had difficulty paying all the costs related to the horses, and that she did not ask her sons for financial help. She also agreed that, in her sworn application for a court-appointed attorney, the only income she reported was from Social Security. She testified that she could not sell any of the horses during the divorce because she was under a court order not to sell the horses until after the divorce was final.

When asked about the fencing and whether it was chewed by the horses, Adams explained that the horses would sometimes kick and the boards would break, and that she did not want to spend money repairing the fence because she knew she was not going to be able to stay on the property. Regarding the empty water troughs, Adams explained that she liked to let the water level in the troughs get low so she could clean them with a pressure washer before refilling them.

Adams agreed that when officers visited the property on January 31, 2014, she had fifteen living and three dead horses. When asked why she did not bury the

17

dead horse that was in the barn, Adams replied that she could not have done it on her own and

> I would have had to call the county. And they will bury for free because they did bury one. But I knew that because of -- trying to pick my words again. Sorry. I knew that my ex-husband would find out because of how tight he is with a lot of people in Montgomery County and the officials and police officers and animal control was going to have to come out there[.]

She explained that she was given written instructions and a timeframe in which to comply and that she understood "that they would come back on random occasions and I better have proof of feed and hay and I had a certain time period to have a vet come and basically . . . to vet all the horses." She believed she had thirty days to comply. According to Adams, she purchased "feed" the same day she received the instructions from Animal Control, and she also cleaned and filled the water troughs. She testified that the officers returned "[a] day or two later[]" and she complained to the officers because she believed she still had time to comply.

When asked if she thought she did anything wrong, Adams explained

> . . . I was constantly on the phone with vets, calling other equine professionals, talking to people on Facebook, doing all kinds of research. I bought all kinds of medicine from my vet. I was doing feed and hay and medicine. And I honestly believed that because he was -- it's already been testified as far as the tax deductions -- I honestly believed on January 1st everything would stop. And we were treating symptoms of the horses.

> . . . .

I believe that I did everything I could as far as vets, feed, and hay.

On cross-examination, Adams agreed she did not call 911 to report that the horses had been poisoned. She also agreed she had no physical proof that her husband poisoned the horses. When asked to explain why she did not have a veterinarian come to her property, she explained that her primary vet that is "an hour and a half drive[]" away would not do a "farm call" to her property and that, when she called that vet's office, they told her "if you want to bring them in, you can, but you can handle this." Adams denied that she intentionally or knowingly denied food or medical care to the animals.

Testimony of Benjamin Cook

Benjamin Cook (Cook) testified for the Defense. Cook indicated that he met Adams in January of 2013, they dated for "about six months[,]" and they remained friends. He agreed that he had personal knowledge of how she cared for her animals when he visited her property. Cook testified that, when he first visited Adams's property, he saw that some of the horses had cuts or scrapes and Cook saw Adams treat the horses' wounds, but "at that time there [were] no horses that had died." Cook testified that during the summer of 2013, he helped Adams take one of the horses to a vet. According to Cook, the "[h]orses were always fed well when [he] was around[,]" from about April 2013 through October 2013, and that

19

"there was always feed [or] hay." Cook also testified that on one visit to Adams's property, near the end of 2013, he observed a dead horse outside, and Cook described Adams as "very upset about the death of the horses." Cook testified that from everything he observed he would allow Adams to care for his dogs. Cook explained that Adams always showed concern for the horses and kept medications for the horses in a refrigerator in the barn.

Testimony of Susan Dancer

Susan Dancer (Dancer) also testified for the defense and by agreement of the parties her testimony was provided telephonically. Dancer has been in charge of the Texas Blessing Animal Rescue (TBA Rescue) for about fourteen years. Dancer explained she met Adams early in 2013 when Adams taught a training clinic held by the TBA Rescue. Dancer denied having any personal knowledge of the condition of horses as they existed on Adams's property; but, Dancer also testified that, when Adams brought four or five of her horses to a TBA Rescue event in January of 2014, the horses were not underfed and Dancer agreed those horses "looked more or less okay[.]" Dancer agreed it was not a "healthy practice" to have your horses eating just a few yards from the carcasses of the dead horses.

Testimony of Michael Adams

The State called Michael Adams (Michael) to testify as a rebuttal witness. Michael testified that Adams is his ex-wife, and their divorce was final on December 3, 2013. State's Exhibit 211, a letter to Adams written by Michael's attorney, was admitted into evidence over the defense's hearsay objection. Michael agreed that, during the pendency of the divorce, he had instructed Adams through his attorney to sell the horses that remained on her property and that State's Exhibit 211 communicated this instruction. Michael also agreed that the final divorce decree awarded Adams all the horses remaining on her property. Michael did not recall whether there was a standing order concerning property in the divorce case, and he testified that he and Adams could have made mutual agreements between them to sell property before the divorce became final.

Other Evidence

State's Exhibit 177, a video of the animals and the property made on the date the animals were seized, was admitted into evidence and published to the jury. Numerous photographs taken at Adams's property on or about February 5, 2014, including photographs of the animals, were also admitted into evidence and published to the jury.

21

COMMITMENT QUESTION DURING VOIR DIRE

In her first issue, Appellant argues that the trial court abused its discretion by sustaining the State's objection that a question the defense asked was an improper commitment question. Appellant argues that, even though the question was a commitment question, it was a proper question because it "gives rise to a valid challenge for cause and only contains those facts necessary to test whether a prospective juror is challengeable for cause."

The trial court has broad discretion over the process of jury selection. *Barajas v. State*, 93 S.W.3d 36, 38 (Tex. Crim. App. 2002). We review a trial court's ruling regarding an alleged improper commitment question under an abuse of discretion standard. *Id.* In this review, our focus is on whether the Appellant proffered a proper question regarding a proper area of inquiry. *See id.* A commitment question is one that commits a prospective juror to resolve, or refrain from resolving, an issue a certain way after learning a particular fact. *See Standefer v. State*, 59 S.W.3d 177, 179 (Tex. Crim. App. 2001). However, not all commitment questions are improper. *Id.* at 181. For example, an attorney may ask a potential juror if she can consider the full range of punishment in a case. *Id.* When the law requires jurors to make certain types of commitments, then the attorneys may ask whether the jurors can follow the law. *Id.* Generally speaking,

when "the law does not require the commitment, a commitment question is invariably improper." *Id.* Accordingly, it is an impermissible commitment question to ask a juror whether she considers a certain type of evidence to be mitigating. *Id.* A question is also impermissible "if it attempts to commit the juror to a particular verdict based on particular facts." *Barajas*, 93 S.W.3d at 38 (citing *Standefer*, 59 S.W.3d at 181). Improper commitment questions are not allowed because we want to "ensure that the jury will listen to the evidence with an open mind" and render a verdict based upon the evidence. *Sanchez v. State*, 165 S.W.3d 707, 712 (Tex. Crim. App. 2005).

Nevertheless, a party may be allowed to ask a question of a potential juror to determine whether a juror may be challenged for cause because he or she possesses a bias against the law upon which the State or defendant is entitled to rely. *Delacerda v. State*, 425 S.W.3d 367, 382 (Tex. App.—Houston [1st Dist.] 2011, pet. ref'd) (citing Tex. Code Crim. Proc. Ann. art. 35.16(b)(3) (West 2006); *Mason v. State*, 116 S.W.3d 248, 255 (Tex. App.—Houston [14th Dist.] 2003, pet. ref'd)). A party may also be entitled to explore with a potential juror whether the juror could convict in the absence of certain physical evidence or whether the juror would hold the State to a burden higher than beyond a reasonable doubt. *Delacerda*, 425 S.W.3d at 382.

23

To determine whether a voir dire question calls for an improper commitment the court must determine (1) whether a voir dire question is a commitment question, (2) whether the commitment question gives rise to a valid challenge for cause, and (3) whether the question includes only necessary facts. *See Lee v. State*, 206 S.W.3d 620, 621 (Tex. Crim. App. 2006) (citing *Lydia v. State*, 109 S.W.3d 495, 499 (Tex. Crim. App. 2003); *Standefer*, 59 S.W.3d at 179-82). We consider the voir dire as a whole when determining whether a question constitutes an improper commitment question. *See Halprin v. State*, 170 S.W.3d 111, 119 (Tex. Crim. App. 2005).

> During voir dire, the following exchange occurred:
>
> [Defense Attorney]: . . . What I want to know is -- and this is just a question, generally, just for the first row -- how many people in the first row believe that if they see -- and this is just a general question -- if you see photos of any animals, especially horses, that you perceive to be abused that you think you know what, I don't think I'm going to sit fair and impartial on this case because there may be other photos just like that or worse, and that's probably going to cause me to not be very fair and impartial? Because we anticipate that they are going to present photos of that nature.
>
> [State's Attorney]: Your Honor, may we approach?
>
> THE COURT: Yes.
>
> (Discussion at the bench, on the record)

24

[State's Attorney]: It's really a commitment question. If you see evidence, photography evidence that appears horses are abused you will find that they are abused. That is a classic commitment question.

[Defense Attorney]: Not find that they are abused. I just said would you be fair and impartial.

THE COURT: Could you be fair and impartial? That I'm fine with that. If you feel you could be fair and impartial. That's fine.

[Defense Attorney]: Okay. What do you think if you see photos of animals that the state is saying have been abused, that you see in some way? Do you think you are going to be fair and impartial? If I see photos that I think showed animals to be abused in some way, shape, or form I don't think I'm going to sit there and be impartial I'm just going to close off --

[State's Attorney]: Your Honor.

THE COURT: Okay. I'll sustain the objection.

[Defense Attorney]: Again, to be fair and impartial. If you believe that what you are looking at, that's not going to cause you, in any way, to give my client a fair trial? Okay. Number one, five, okay. Let's go number one and --

[State's Attorney]: Your Honor, renew my objection.

THE COURT: Okay. I'm still going to sustain it.

Adams admits in her appellate brief that the question of whether jurors could be fair and impartial after seeing photographs of abused horses is a commitment question, but argues it was not an improper commitment question because the line of questioning was an attempt to determine "whether they would be fair and

impartial if they were to see photos of any animals, especially horses, that they perceive to be abused." Appellant argues the questioning was proper because a member of the panel who could not be impartial would be biased or prejudiced against the defendant and could be challenged for cause.

The Court of Criminal Appeals has explained that neither the State nor the defendant may ask the venire "'under the evidence that will be introduced in this case, would you convict the defendant?'" *See Barajas*, 93 S.W.3d at 39. When a specific set of facts are supplied beyond what is necessary to sustain a challenge for cause, it may render improper what would otherwise be a proper question. *Delacerda*, 425 S.W.3d at 381 (quoting *Braxton v. State*, 226 S.W.3d 602, 604 (Tex. App.—Houston [1st Dist.] 2007, pet. dism'd)). The questions at issue in the case at bar did not address a potential bias against a phase of the law but sought to commit a juror regarding how the juror would respond in the face of specific evidence. *Compare id.* at 383 (question to the venire was not improper because it "'did not attempt to commit the prospective jurors to a specific set of facts prior to the presentation of evidence at trial[]'") (quoting *Braxton*, 226 S.W.3d at 606). Therefore, we conclude that the trial court did not abuse its discretion in sustaining the objections made by the State and refusing to allow the question.

Nevertheless, even if the trial court erred, we subject the erroneous exclusion of a proper question during voir dire to a harm analysis under rule 44.2(b). *See Woods v. State*, 152 S.W.3d 105, 109-10 (Tex. Crim. App. 2004) (citing Tex. R. App. P. 44.2(b); *Jones v. State*, 982 S.W.2d 386, 391-94 (Tex. Crim. App. 1998)); *see also Easley v. State*, 424 S.W.3d 535, 541 (Tex. Crim. App. 2014) (trial court's error in prohibiting defense counsel from asking proper questions of the venire was non-constitutional error). "Under this analysis, a defendant is harmed only if (1) he exhausts all of his peremptory challenges, (2) he requests more challenges, (3) his request is denied, and (4) he identifies an objectionable person seated on the jury on whom he would have exercised a peremptory challenge." *See Wingo v. State*, 143 S.W.3d 178, 186 (Tex. App.—San Antonio 2004), *aff'd*, 189 S.W.3d 270 (Tex. Crim. App. 2006) (citing *Anson v. State*, 959 S.W.2d 203, 204 (Tex. Crim. App. 1997)). After examining the record and applying the requisite harm analysis, we conclude that any error by the trial court by sustaining the State's objection and in disallowing the question was harmless. Appellant failed to establish that she exhausted all peremptory challenges, that she made a request for more challenges, that her request was denied, and that she identified an objectionable person seated on the jury on whom she would have exercised a peremptory challenge. *Id.* at 187 (citing *Anson*, 959 S.W.2d at 204); *cf. Halprin*, 170 S.W.3d at 118 n.7 ("Appellant

27

does not state in his brief whether he challenged these veniremembers for cause, or whether he exercised peremptory challenges on them, or whether any of them actually sat on his jury.") (citing *Anson*, 959 S.W.2d at 204). We overrule Appellant's first issue.

## ADMISSION OF EVIDENCE

Appellant's remaining two issues challenge the trial court's admission of certain evidence. In her second issue, Appellant argues that the trial court abused its discretion by "allowing Appellant's son [Matthew] to testify about her mental state over defense counsel's objection as to speculation and qualification." Appellant contends that Matthew lacked the requisite personal knowledge necessary to answer the question of whether his mother was "losing touch with reality[.]"[3] And in her third issue, Appellant argues that the trial court erred in admitting a letter generated by Appellant's ex-husband's attorney, which Appellant argues was inadmissible hearsay evidence.

We review a trial court's decision regarding the admission of evidence for an abuse of discretion. *See De La Paz v. State*, 279 S.W.3d 336, 343-44 (Tex. Crim. App. 2009). "As long as the trial court's ruling is within the 'zone of

---

[3] We note that Appellant did not object at trial, nor does she argue on appeal, regarding a lack of foundation or to the qualification of the witness to make such a judgment or render such an opinion.

reasonable disagreement,' there is no abuse of discretion, and the trial court's ruling will be upheld." *Id*. (quoting *Montgomery v. State*, 810 S.W.2d 372, 391 (Tex. Crim. App. 1991) (op. on reh'g)); *State v. Mechler*, 153 S.W.3d 435, 439-40 (Tex. Crim. App. 2005). If the trial court's decision is correct on any theory of law applicable to the case, we will uphold the decision. *De La Paz*, 279 S.W.3d at 344; *Osbourn v. State*, 92 S.W.3d 531, 538 (Tex. Crim. App. 2002).

Complained-of Testimony from Matthew

At trial, the State questioned Matthew, Appellant's son, concerning Appellant's treatment of the horses, and the following exchange occurred:

[State's Attorney]: Would you say that during that time your mother was losing touch with reality?

[Defense Attorney]: Objection. Calls for speculation. It's not qualified.

THE COURT: Overruled.

[State's Attorney]: You can go ahead and answer the question.

[Witness Matthew]: I don't know if she was losing touch with reality. There was definitely a sense of desperation, holding onto any glimmer of hope that she could make this work. She wanted to succeed. She felt like she had something to prove to people that she could be successful on her own, that she didn't need a man in her life to do these things. She was holding onto this so she could feel like she could make it work.

A witness may testify to a matter of which he has personal knowledge. *See* Tex. R. Evid. 602. Evidence to prove personal knowledge may consist of the witness's own testimony. *Id.* Although an individual would not have personal knowledge of another's mental state, it is quite another thing if the testimony is an "interpretation of the witness's objective perception of events (i.e. his own senses or experience)." *Fairow v. State*, 943 S.W.2d 895, 899 (Tex. Crim. App. 1997); *see also Solomon v. State*, 49 S.W.3d 356, 364 (Tex. Crim. App. 2001). A person may possess "personal knowledge of facts from which an opinion regarding mental state may be drawn." *Fairow*, 943 S.W.2d at 899. A witness's opinion testimony will satisfy the personal knowledge requirement if it is an interpretation of the witness's objective perception of events. *Id.*; *see also Osbourn*, 92 S.W.3d at 535-36 (a witness's testimony can include opinions, beliefs, or inferences as long as they are drawn from his own experiences or observations).

In this case, Matthew testified that Appellant is his mother, he had grown up around Appellant and her horses, he visited her in 2013, and he personally observed the condition of the horses. Matthew also testified that his mother asked for his advice, he knew she was going through a divorce and she was having problems with money, and he believed she had a drinking problem. Further, Matthew explained he personally observed Appellant's response when he told her

30

he was concerned about the health of the horses, and he was "shocked[]" when Appellant told him her ex-husband was poisoning the horses.

The portion of the testimony of which Appellant complains was Matthew's testimony that his mother was "losing touch with reality[,]" which the trial court could have determined was merely Mathew's interpretation or inference based on his personal perception of the relevant events and was rationally based on what he had perceived. *See Fairow*, 943 S.W.2d at 898-900. Therefore, we cannot say the trial court erred in overruling the objection and admitting the particular testimony.

<u>Admission of Letter</u>

In her third issue, Appellant argues that the trial court erred in admitting a letter written by an attorney who was representing her ex-husband Michael. The State argues that the letter was offered as a rebuttal to the testimony provided by the Appellant that she could not sell her horses until after the divorce became final. The State contends the letter was offered not for the truth of the matter asserted therein, but to show the effect on the listener, and to rebut Appellant's testimony that she believed she could not sell the horses.

At trial, the State offered rebuttal testimony from Michael Adams, the Appellant's ex-husband.

[State's Attorney]: Yes, Your Honor. State calls Michael Adams.

(Discussion at the bench, on the record)

[State's Attorney]: May we approach? We recognize rebuttal is narrowly tailored to specific issues. On the stand the defendant said, "I couldn't get rid of these horses." She wasn't able to sell them. Mr. Adams is going to come in and say, also, that she may or may not be divorced. Mr. Adams is going to come in and say, yes, they were divorced. Yes, she had the freedom to dispose of the horses in any way she could. And that's all.

THE COURT: Okay.

[Defense Attorney]: Judge, if that's the case I would like to be able to put my client up there.

THE COURT: Yeah. You can rebut the rebuttal, but it has to be limited in scope. Unlike other witnesses, it narrows down to what we're talking about [only].

. . . .

THE COURT: Have a seat. I'm going to inform the jury what we're doing at this point. Normally, you hear from the state and each [party] calls their own witnesses. This is a rebuttal witness. This testimony is only going to be limited to rebutting testimony that's been put forth. After they are finished with their rebuttal the defense may call rebuttal witnesses if they choose [to] go ahead. But now the scope is limited to only rebuttal of evidence put on by the other side.
Go ahead.

During the State's questioning of Michael, the State asked Michael questions about the divorce and whether the Appellant could sell the horses during the pendency of the divorce. The State showed Michael State's Exhibit 211, a letter dated June 5, 2013, from Michael's divorce attorney addressed to Appellant,

32

wherein the attorney conveyed Michael's proposal of the payment of certain items pending the final decree and also Michael's request for Appellant to sell the horses. The defense objected to the letter on the basis that it was hearsay. The State responded and explained that the letter was relevant to establish Appellant's state of mind, that "she knew she could get rid of the horses." The court overruled the objection and allowed the letter into evidence. Thereafter, Michael testified as follows:

> [State's Attorney]: . . . During the pendency of your divorce, was there ever a point where you instructed the defendant through your attorney to sell the horses that were remaining on her property?
>
> [Witness Michael]: Yes.
>
> [State's Attorney]: Is that stated in this letter that was sent to the defendant?
>
> [Witness Michael]: Yes.
>
> [State's Attorney]: Okay. Is this the part here? "Accordingly, Mr. Adams would like to place the following items on the market for sale as soon as possible."
>
> [Witness Michael]: Yes, ma'am.

"Hearsay" means a statement that the declarant does not make while testifying at the current trial or hearing that is offered into evidence to prove the truth of the matter asserted in the statement. *See* Tex. R. Evid. 801(d). If a statement is being offered not to prove the truth of the matter asserted therein but

33

for some other basis, the statement is not hearsay. *Dinkins v. State*, 894 S.W.2d 330, 347 (Tex. Crim. App. 1995); *Johnson v. State*, 425 S.W.3d 344, 346 (Tex. App.—Houston [1st Dist.] 2011, pet. ref'd) ("An extrajudicial statement or writing that is offered for the purpose of showing what was said, rather than for proving the truth of the matter stated therein, does not constitute hearsay."). For example, "[s]tatements offered only to show their effect on the listener are not hearsay." *McNeil v. State*, 452 S.W.3d 408, 419 (Tex. App.—Houston [1st Dist.] 2014, pet. ref'd). This Court has previously stated: "'The general rule then is that evidence of written or spoken expressions when offered, not to prove the facts, if any, stated therein, but to show as an inference therefrom, the state of mind of the person by whom or to whom they were communicated, is not violative of the hearsay rule.'" *Traders & Gen. Ins. Co. v. Derrett*, 340 S.W.2d 305, 311 (Tex. Civ. App.—Beaumont 1960, writ ref'd n.r.e.) (quoting 1 McCormick & Ray, Texas Law of Evidence, § 796); *see also Phenix v. State*, 488 S.W.2d 759, 761-62 (Tex. Crim. App. 1972) (the rule against hearsay does not apply when an extrajudicial written utterance is admitted for its nontestimonial value as evidence of a circumstance) (citing 6 Wigmore on Evidence, §§ 1788-1792); *Int'l Brotherhood of Boiler Makers v. Rodriguez*, 193 S.W.2d 835, 842, (Tex. Civ. App.—El Paso 1945, writ

dism'd) (citing McCormick & Ray, Texas Law of Evidence, § 357; 6 Wigmore on Evidence, §§ 1788-1789).

Even if the complained-of evidence was hearsay and erroneously admitted, we apply the standard for nonconstitutional error contained in Rule 44.2(b) of the Texas Rules of Appellate Procedure if the trial court's ruling merely offends the rules of evidence. *See Solomon*, 49 S.W.3d at 365; *Melgar v. State*, 236 S.W.3d 302, 308 (Tex. App.—Houston [1st Dist.] 2007, pet. ref'd). An improper admission of complained-of evidence is harmless when the record establishes that essentially the same evidence is admitted elsewhere in the record without objection. *See Marshall v. State*, 210 S.W.3d 618, 631 (Tex. Crim. App. 2006) ("any error in the admission of the complained-of evidence was harmless" when the record established appellant brought out essentially the same evidence during his direct examination); *Lane v. State*, 151 S.W.3d 188, 193 (Tex. Crim. App. 2004) (court of appeals did not err in upholding trial court's admission of victim's out-of-court statements where the record reflected such statements came into evidence on eight separate occasions without objection) (citing and quoting *Valle v. State*, 109 S.W.3d 500, 509 (Tex. Crim. App. 2003) ("An error [if any] in the admission of evidence is cured where the same evidence comes in elsewhere without objection.")).

On direct examination and later during cross-examination, Michael testified that he gave instructions through his attorney to Adams that she should sell the horses. Such testimony was admitted without objection, and further inquiry on the issue was reintroduced into the record during cross-examination by the defense. Therefore, even assuming it was improper to admit the letter, the complained-of evidence was harmless because the record establishes that essentially the same evidence was admitted elsewhere in the record without objection. *Marshall*, 210 S.W.3d at 631.

Additionally, based on our review of the entire record, we have fair assurance that any error in the admission of Matthew's testimony concerning Adams's state of mind or the admission of the complained-of letter did not have a substantial and injurious effect or influence in determining the jury's verdict. *See Casey v. State*, 215 S.W.3d 870, 885 (Tex. Crim. App. 2007). We overrule Appellant's second and third issues on appeal.

Having overruled all of Appellant's issues, we affirm the judgments of the trial court.

AFFIRMED.

_____
LEANNE JOHNSON
Justice

Submitted on September 21, 2016
Opinion Delivered November 16, 2016
Do Not Publish

Before Kreger, Horton, and Johnson, J.J.